635 F.2d 1255
 105 L.R.R.M. (BNA) 3172, 90 Lab.Cas. P 12,361
 MIDWEST STOCK EXCHANGE, INC., Midwest Clearing Corporation,
Midwest Securities Trust Co., and Midwest Stock
Exchange Service Corp., Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 No. 79-2061.
 United States Court of Appeals,
Seventh Circuit.
 Argued May 9, 1980.
Decided Nov. 10, 1980.
 
 Lisa S. Kohn, Chicago, Ill., for petitioners.
 Charles P. Donnelly, N.L.R.B., Washington, D. C., for respondent.
 Before CUMMINGS, Circuit Judge, NICHOLS, Associate Judge,* and PELL, Circuit Judge.
 
 
 1
 NICHOLS, Associate Judge.
 
 
 2
 The question presented in this case is whether there is substantial evidence on the record as a whole to support various findings of the National Labor Relations Board (Board). Because we find there is not substantial evidence to support many of the board's findings, we doubt whether the board would have us enforce the portions that are based on substantial evidence and remand to the board to consider what action it wishes to take on the portions that are based on substantial evidence.
 
 Facts
 
 3
 To dispose of this case we must consider an order of the board against Midwest Stock Exchange (Exchange) upon the Exchange's petition for review and the board's cross-petition for enforcement of the order pursuant to Sections 10(e) and (f) of the National Labor Relations Act, as amended, 29 U.S.C. § 160(e), (f) (act). The board adopted as its own a decision by Administrative Law Judge Maloney, including rulings, findings, and conclusion.
 
 
 4
 The Exchange is a regional stock exchange, located in Chicago, Illinois. Midwest Clearing Corporation (Clearing) and Midwest Securities Trust Corporation (Trust) are wholly owned subsidiaries of the parent Exchange. Clearing is responsible primarily for settling and facilitating securities transactions, while Trust is a custodial depository in which member brokers deposit stock certificates.
 
 
 5
 On September 12, 1977, the Office and Professional Employees International Union (Union) filed a representation petition with the board seeking certification as the bargaining representative of all Exchange office and clerical workers. On December 15, 1977, the board issued a decision calling for an election. During the election campaign, the Exchange allegedly committed several unfair labor practices which are discussed in part B of this opinion. On January 26, 1978, the Union was victorious in that election, but the final outcome was not official for a month pending the resolution of challenged ballots. On January 27, 1978, the Exchange's vice president, Martin Torosian, determined that a reduction in Trust and Clearing personnel was necessary, allegedly because of mounting losses. He dismissed 11 employees and transferred five. The following Trust and Clearing employees were the ones dismissed: Rochelle Stewart, Mary Hrycaj, Theresa Stewart, Mae Belle Hobby, and Marjorie Ayersman. The board, in adopting the findings of the Administrative Law Judge (ALJ), determined that each of these discharges violated § 8(a)(3) of the act and that certain Exchange actions during the unionization campaign violated § 8(a)(1).
 
 
 6
 The relevant text of § 8(a)(1), (3), is as follows:
 
 8. Unfair labor practices
 
 7
 (a) Unfair labor practices by employer
 
 
 8
 It shall be an unfair labor practice for an employer-
 
 
 9
 (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;
 
 
 10
 (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization:
 
 
 11
 In reaching his decision, the ALJ did not accept the Exchange's alleged economic justification for the discharges. The ALJ found the Exchange historically employed the same number of personnel regardless of the securities volume and adjusted employee's overtime up or down to accommodate any change in securities volume. The ALJ placed heavy weight on the Exchange's failure on the occasion of the Union victory to do what it had normally done before. The ALJ also found that the Exchange actually hired 26 new employees during the period of terminations. This factual analysis provided the underpinning of his decision that there was no economic crisis that warranted a reduction in personnel. Finally, the ALJ found specific instances of discriminatory motivation sufficient for him to conclude each termination violated § 8(a)(3). The ALJ stated he used the § 8(a)(1) violations as the backdrop against which he evaluated the discharges of the employees. On the basis of those findings, the ALJ ordered reinstatement with back salary for the five discharged employees.
 
 
 12
 Before us the Exchange argued that the ALJ's findings of discriminatory employee terminations were not based on substantial evidence. The Exchange further argued that there was insufficient evidence on the record to merit findings of § 8(a)(1) violations. Finally, the Exchange contended that § 8(a) (1) violations, without more, could not provide the necessary proof of specific antiunion purposes behind an employee discharge.
 
 
 13
 The issue is whether there is sufficient evidence on the record to support the findings of § 8(a)(3) and 8(a)(1) violations. This opinion discusses in Part A the inadequacies of the ALJ's findings of no economic justification and of antiunion discrimination in connection with the discharges. We discuss in Part B the ALJ's findings of other § 8(a)(1) violations, several of which are unsupported in the record.
 
 A. Discriminatory Discharges
 
 14
 We approach this problem with a clearly defined role. Congress has given this court the duty of scrutinizing the record as a whole. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). Mindful that it is not our task to assess the facts of this case de novo, neither is it to function as a "judicial echo" or rubber stamp for the conclusions of the board. Id. at 491, 71 S.Ct. at 466; NLRB v. Wire Products Manufacturing Corp., 484 F.2d 760, 765 (7th Cir. 1973). Under Universal Camera Corp. v. NLRB, 340 U.S. at 490, 71 S.Ct. at 465-
 
 
 15
 * * * The Board's findings are entitled to respect; but they must nonetheless be set aside when the record before a Court of Appeals clearly precludes the Board's decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both.
 
 
 16
 The well-established rule in § 8(a)(3) cases requires the board to "show affirmatively by substantial evidence that the discharge was discriminatory and motivated by * * * alleged union activities." Portable Electric Tools, Inc. v. NLRB, 309 F.2d 423, 426-27 (7th Cir. 1962). Since motive, which is the determinative factor in finding a violation of § 8(a)(3), is a mental attitude, the board may rely on "circumstantial as well as direct evidence." W.W. Grainger, Inc. v. NLRB, 582 F.2d 1118, 1120 (7th Cir. 1978); McGraw-Edison Co. v. NLRB, 419 F.2d 67, 75 (8th Cir. 1968) (Blackmun, J.). Merely because the board can rely on circumstantial evidence, however, does not excuse it from meeting its affirmative burden. This court will not infer lightly an unlawful purpose nor will it allow the board to base its case on suspicion, especially where, as here, there is no showing of disproportionate treatment in discharges and rehirings. See NLRB v. American Casting Service, Inc., 365 F.2d 168, 172 (7th Cir. 1966). See also, Delco-Remy Division, General Motors Corp. v. NLRB, 596 F.2d 1295, 1306 (5th Cir. 1979).
 
 
 17
 After a thorough and thoughtful examination of a record that includes 1,058 pages of transcript alone, we must hold that the board did not meet its affirmative duty for the following reasons.
 
 1. Economic Justification
 
 18
 The ALJ's conclusion that there was no economic crisis that warranted a reduction in personnel ignores the great weight of the evidence. The General Counsel did not contest that there was an economic crisis. But the ALJ concluded from the following chart that the Exchange normally adjusted overtime to accommodate fluctuations in security volume and would have followed that practice in the instant case were it not for discriminatory intent.
 
 
 19
 Number of
 Stock Hours of
 Week Certificates Overtime Total
 Ending Handled Worked Personnel
----------- ------------ ---------- ----------
7/1/77 184,325 184 298
7/8/77 ** 133,957 163 295
7/15/77 194.546 289 294
7/22/77 107,847 387 295
7/29/77 178,992 251 292
 * * * * *
1/6/78 84,019 34 294
1/13/78 101,032 56 294
1/20/78 95,064 55 293
1/27/78 75,140 51 293
2/4/78 89,831 42 293
2/11/78 77,900 45 284
2/18/78 ** 78,523 55 285
2/25/78 ** 71,520 42 299
3/4/78 80,900 201 302
3/10/78 93,505 120 290
3/18/78 93,115 106 291
3/25/78 66,494 135 287
4/1/78 84,651 91 284
4/8/78 No figures furnished
4/15/78 101,230 47 285
4/22/78 108,856 68 285
4/29/78 114,147 119 282
 
 
 20
 ** week includes a holiday
 
 
 21
 The court, however, can find no statistical correlation between the number of stock certificates handled and the hours of overtime worked. For example, on the week ending July 1, 1977, 184 hours of overtime were worked and 184,325 stock certificates were handled. Yet on the week ending July 22, 387 hours of overtime were worked and only 107,847 certificates handled. A doubling in overtime hours with a 40 percent reduction in the number of stock certificates handled does not demonstrate an Exchange business practice of adjusting overtime according to volume handled. Also, the chart would seem to show that overtime was not related to the volume of securities transactions since the maximum amount of overtime for any period shown remained always well under 1 hour per week per employee; thus employees worked always on the average between 40 to 41 hours, while variations in securities volume reached two and one-half to one.
 
 
 22
 The ALJ also noted that the Exchange's overtime payments during the week of March 4, the last week on which a discriminatory discharge was alleged to have occurred, "shot up" from an average of about 50 hours per week for the preceding two months to a "whopping" 201 hours. If "whopping" means large, it is difficult to characterize 201 as a "whopping" increase when a total number of 302 employees is considered, and how it was divided among them is not given. The word "whopping" is more often found in journalism than in legal writing. Placed before a monetary figure it somehow denotes a hugeness that the figure itself unadorned would not convey, and it substitutes for any comparisons that factually might establish the figure to be out of line. Here we have a number of overtime hours called "whopping" that is less than 1 hour per employee per week, nor is there anything to show that even this trifling overtime was worked by persons whose workload was directly affected by changes in the volume of security transactions. The word "whopping" thus has become a meaningless cliche and we suggest its replacement be "lumping," which means even less.
 
 
 23
 Therefore, the court holds that the ALJ's use of the various overtime figures to conclude that the Exchange was not suffering from economic problems (or if it did, that they were not the reason for the firings) to be unsupported and unreasonable. There is not even a scintilla of evidence to support such a conclusion. See Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938). Given the history of the erratic fluctuations in overtime, its use as an indicator is useless. Furthermore, the ALJ did not demonstrate a causal nexus between the discharge of some employees and a corresponding increase in overtime to the remaining employees within the relevant department. Without such a nexus, the court is confronted with a speculative inference that overtime was increased to compensate for the allegedly discriminatory discharges. Such an inference is without support.
 
 
 24
 Another misuse of raw numerical data is illustrated by the ALJ's finding that a total increase in the Exchange's work force evidenced an absence of economic curtailment. The Exchange's vice president, Torosian, however, testified without contradiction that he cut personnel only in six departments where the volume of work had decreased and that personnel increased in departments where there was an increase in activity. The ALJ did not refer to this testimony.
 
 
 25
 In addition, we find a myriad of other failures of the ALJ to refer to uncontradicted testimony that detracted from his finding that the Exchange's economic justification for the employee terminations was only a sham and that the actual reason for the terminations was an antiunion animus. It is undisputed on the record that in 1978 there was a long term decline in the securities and national stock exchange industries. This decline caused a drop in the number of Exchange customers and in the volume of securities handled. As a result, revenues concomitantly decreased, and Trust and Clearing suffered an $860,000 loss in 1977. The ALJ, however, concluded that the claimed loss was immaterial and merely meant the Exchange's shareholders were charging themselves less for services rendered at the Exchange than it cost to process their security transactions. If the Exchange was indifferent to its recovery of operating costs, as the ALJ seemed to believe, it lacked any economic motive to object to the unionization of its members. We may take notice that a regional stock exchange, like any business, must control its costs. Its costs in handling any widely held security must compare with the cost to the national stock exchange at New York handling the same security. In fact, there was uncontroverted testimony in the record that the goal of the Exchange was to be cost effective. Thus, the ALJ's discrediting without explanation of Torosian's statement that the Exchange had to control its costs is unreasonable.
 
 
 26
 It is also undisputed that the Exchange took various measures to combat the declining economic trend. In December 1976 the Exchange cut the night shift in Trust's Security Processing Department from 50 employees to nine. In September 1977, when Service was losing money and required a loan of $6 million, the Exchange curtailed various operations performed by Service. In May 1977 the Exchange instituted an austerity program designed to reduce Clearing and Trust costs by $45,000 per month. Therefore, as of January 1978, the Exchange had made several unsuccessful attempts at reducing costs. By the middle of January, Torosian predicted that January 1978 would be financially disastrous. During January 1978, the operating loss of Trust and Clearing amounted to $105,000 or $1.25 million at a yearly rate. Without commenting on most of this evidence, the ALJ somehow was able to conclude that the Exchange's job terminations were not economically motivated and suddenly were imposed because of the union's electoral victory.
 
 
 27
 Throughout its analysis of the economic justification issue, the ALJ's opinion often reads more like an advocate's than a judge's, but even an advocate must use statistics with respect. The ALJ also drew conclusions without any support in the record and contrary to uncontradicted testimony. Although an ALJ may reject uncontradicted testimony, the ninth circuit has held he may not reject it without a detailed explanation. E. g., White Glove Building Maintenance, Inc. v. Brennan, 518 F.2d 1271, 1273 (9th Cir. 1975). We find a dearth of such explanations-even perfunctory ones-in the ALJ's opinion before us. Needless to say, after this court's independent analysis of the record, we do not hold that the ALJ's finding of no economic justification for the discharges is wrong, for that would invade his purview. We do hold, however, to be unreasonable and not based on substantial evidence, his conclusion that the Exchange's economic justification was a sham.
 
 
 28
 2. Specific instances of alleged discriminatory discharges.
 
 
 29
 Given the economic situation and the need for the Exchange to cut costs, the next question is whether the discharges discriminated against the employees because of their union activities. There were 16 employees discharged or transferred, only five of whom had involved themselves in the union either through direct activity or by placing their names on a list of 22 union adherents. Thus, 11 of the 16 affected employees were not named on that union list, and 17 of the 22 employees on the union list were not affected. In addition, 15 union supporters received raises, while two, including an election observer, were promoted. Yet of the five employees who were discharged, the only union activity of two of those employees was the appearance of their names on the union list.
 
 
 30
 Uncontradicted evidence in the record shows that Torosian held a meeting on January 31, 1978, in which he announced the Exchange's policy on terminations to the affected department managers. Each manager was informed of the number of personnel reductions required. If the manager selected for termination one or more of several employees in the same position, the matter was referred to William Seithel, Director of Personnel, who made the final decision. The ALJ, however, neglected even to discuss this company policy. The ALJ also ignored productivity reports, company evaluations of performance, transfer suitability, and employee comparisons. The ALJ preferred to repeat the litany that the discharge was accomplished against a background of union activity, animus, false pretext, etc., without presenting facts to show support and without discussing contrary evidence. The ALJ analyzed the record on the § 8(a)(3) violation as though the burden were on the Exchange to exonerate itself of the charges made against it.
 
 
 31
 The record fails to present substantial evidence that any of the five employees were discharged as a result of union activities.
 
 
 32
 a. Rochelle Stewart
 
 
 33
 The ALJ found that Stewart had received ratings of above average and an achievement award, though she had also been placed on probation for insubordination. The ALJ also credited the statement of a former supervisor that Stewart was a troublemaker and was fired for that reason, but the record does not show that this supervisor played a role in Stewart's discharge.
 
 
 34
 The ALJ, however, neglected other evidence in the record. The director of Stewart's department, Mr. Fedor, decided that the elimination of one clerk out of three was necessary to comply with Torosian's curtailment policy. Pursuant to that policy, Seithel evaluated all three clerks' files and determined one clerk, whose name was also on the union list, should be retained because of better performance. The other clerk was retained after a comparison of his record, which included a letter of commendation, against Miss Stewart's record, which contained a letter of probation. According to Exchange Exhibit 33, Stewart was placed on probation for not performing duties independently or willingly, not accepting criticism, and not setting a positive example. Also noteworthy is the fact that Stewart was rehired by the Exchange once volume increased. Given the entire record in this case, the board has not met its burden of presenting substantial evidence showing Miss Stewart was discriminatorily discharged because of her union activities.
 
 
 35
 b. Mary Hrycaj
 
 
 36
 The ALJ found that Miss Hrycaj was a group leader who was fired because of her involvement in unionization activities. Testimony in the record, however, shows that the Exchange decided to eliminate the group leader positions within Miss Hrycaj's department because of a decline in volume. In addition to Hrycaj, the position of Helen Opsenica, the other group leader, with no union connection, was also terminated. If the Exchange punished the one for supporting the union, it likewise punished the other for not supporting it.
 
 
 37
 The ALJ focused on the Exchange's "no bumping" policy which prohibited an employee transfer when that employee's salary was above the midpoint of the salary range for the requested transfer position. The ALJ found the ability of the personnel officer to waive the policy rendered that policy nonexistent. The ALJ failed to explain, however, uncontroverted evidence in the record that the policy was applied to union and nonunion employees equally. For example, Opsenica was prohibited from taking a voluntary demotion. Since the record shows that the Exchange eliminated the positions of group leaders in response to declining volume, we hold that the mere fact the Exchange could waive the "no bumping" policy to be insufficient evidence to prove that it was discriminatorily applied to Miss Hrycaj.
 
 
 38
 c. Theresa Stewart
 
 
 39
 The ALJ found that Theresa Stewart, sister of Rochelle Stewart, was a cashier who had distributed and collected union cards. Although the Exchange contends that T. Stewart's only union activity was the appearance of her name on the union list, the ALJ's finding has support in the record. The ALJ further found T. Stewart's record to be generally favorable. Her job was transferred to another department on the basis of a year-old report the ALJ characterized as "dusted off and put into effect." The ALJ also credited the testimony of T. Stewart and former Exchange supervisor Richardson that Richardson, while still a supervisor, had told T. Stewart she should be careful because management was planning to terminate union organizers. These findings resulted in the ALJ's conclusion of an unlawful discharge.
 
 
 40
 The record, however, shows that T. Stewart had lower performance and productivity ratings than any other employee in her department. The record also shows she was unsuitable for other jobs in Clearing because of previous broker complaints. In crediting T. Stewart and Richardson, ALJ Mahoney appears to have followed his penchant for crediting testimony like that a sister court has characterized as incredible. See Delco-Remy Division, General Motors Corp. v. NLRB, supra, 596 F.2d at 1303. Richardson's testimony indicated an unreliable memory and his various accusations against Exchange management of antiunion statements were refuted by 15 witnesses. See our comment on him below under the heading "Threats." T. Stewart provided the only testimony that corroborated Richardson's. T. Stewart, however, mentioned these conversations to a board agent one week before the hearing. And although she testified these conversations occurred in mid-February or later, she also testified that she mentioned them to her sister Rochelle prior to her sister's termination on February 3. It is also noteworthy that the ALJ did not credit any other of Robinson's antiunion statements.
 
 
 41
 This court believes that the ALJ's finding that T. Stewart was terminated in violation of § 8(a)(3) is incredible and not based on substantial evidence. We hold that the crediting of the statements of Richardson is not based on substantial evidence. Although the ALJ generally is upheld on credibility determinations, there are certain times when a court must overrule such a determination by examining evidence in the record that detracts from the ALJ's findings. E. g., NLRB v. Adam & Eve Cosmetics, Inc., 567 F.2d 723 (7th Cir. 1977). Otherwise an ALJ would have to be upheld whenever there was the slightest support in the record, and our standard of review would be transformed from substantial evidence to scintilla evidence. See generally K. Davis, Administrative Law of the Seventies (1976) § 29.06.
 
 
 42
 d. Mae Belle Hobby
 
 
 43
 Mae Belle Hobby commenced work in 1975 and was a keypunch operator at the time of her discharge. The ALJ found her union activities limited to the appearance of her name on the union organizing list. In mid-February the Exchange decided to eliminate three keypunch positions, and two employees were immediately discharged on the basis of their records. The Exchange then narrowed its choice on the third employee to be discharged to either Hobby or Loraine Mims, and chose to retain Mims on the basis of overtime hours worked. Despite the Exchange's justifications, the ALJ, without explanation, found an improper discharge based on animus, union activity, company knowledge, and false pretext. Given this record and the Exchange's justifications as opposed to the ALJ's conclusory finding without explanation, we frankly cannot find that the ALJ found any evidence of an unlawful discharge.
 
 
 44
 e. Marjorie Ayersman
 
 
 45
 At the time of her discharge, Ayersman had six years of service. The appearance of her name on the union list was her only union activity. The ALJ found that for a period of four months, from the time Ayersman's section changed its reporting time to 7:00 a. m. until two weeks after the election, the Exchange allowed her and three other individuals to report to work at 7:15 a. m. In mid-February the Exchange decided to eliminate this exception. Ayersman, however, was promised a transfer to another position, but that position was abolished as a result of the economic curtailment. It appears the ALJ found that because the Exchange had allowed her to report late and subsequently terminated her because she could not report at the desired time, the Exchange violated § 8(a)(3).
 
 
 46
 The undisputed record, however, shows that the Exchange decided to eliminate four positions of cashiers who were habitually tardy in arriving at work in Ayersman's department. Ayersman, however, was the only one out of the four who was involved in the union. The ALJ did not credit testimony that the special time exception given to these four employees created a morale problem and ignored testimony that the department manager and Seithel had discussed the need to eliminate tardy employees and delayed acting, hoping other alternatives would work. Also, the employees were told on November 14, 1977, that the 7:00 a. m. starting time was mandatory. On December 10, 1977, the tardy employees were given one more month to meet the required starting time. On January 17, 1978, the department manager gave the employees one more month, and on February 6, the termination of the four cashier positions was decided upon. On February 6, two positions opened, but Ayersman's application was denied because she indicated she might retire. A later transfer was approved, but that position was eliminated in a further cut.
 
 
 47
 The record shows that the Exchange decided to eliminate the positions of four tardy employees. Such a decision is a prerogative of business that need not be justified by meeting an affirmative burden of proof. Ayersman was the only cashier out of the four affected who had a union link, and that minimal link was the appearance of her name on a union list. Furthermore, Ayersman was given a number of opportunities to rearrange her schedule. We do not, therefore, feel the board met its affirmative duty of showing an unlawful discharge.
 
 
 48
 3. Use of § 8(a)(1) violations to prove § 8(a)(3) violations.
 
 
 49
 The ALJ relied on § 8(a)(1) violations to provide proof of specific antiunion purposes behind each discharge. The ALJ also placed heavy weight on the discharged employees' union activities and company knowledge of such activities. Such findings, however, without more do not prove an unlawful discharge, as the board must prove specific antiunion purpose behind the discharge in question. Portable Electric Tools, Inc. v. NLRB, supra, 309 F.2d at 426. Therefore, given our findings on the Exchange's economic situation and the specific facts behind each discharge, the § 8(a)(1) violations alone are legally insufficient to show the board met its burden of proof that the specific employee was discharged because of union activity.
 
 
 50
 4. Summary on unlawful discharges.
 
 
 51
 The ALJ and board are not business managers who decide what is best for business. As this court stated 18 years ago in Portable Electric Tools, Inc. v. NLRB, supra, 309 F.2d at 426, citing NLRB v. McGahey, 233 F.2d 406, 412-13 (5th Cir. 1956)-
 
 
 52
 "The Board's error is the frequent one in which the existence of the reasons stated by the employer as the basis for the discharge is evaluated in terms of its reasonableness. If the discharge was excessively harsh, if lesser forms of discipline would have been adequate, if the discharged employee was more, or just as, capable as the one left to do the job, or the like then, the argument runs, the employer must not actually have been motivated by managerial considerations, and (here a full 180 degree swing is made) the stated reason thus dissipated as pretense, nought remains but antiunion purpose as the explanation. But as we have so often said: management is for management. Neither Board nor Court can second-guess it or give it gentle guidance by over-the-shoulder supervision. Management can discharge for good cause, or bad cause, or no cause at all. It has, as the master of its own business affairs, complete freedom with but one specific, definite qualification: it may not discharge when the real motivating purpose is to do that which Section 8(a)(3) forbids."
 
 
 53
 Congress has left to management the decisions of whether a reduction in the number of employees is necessary, or what the proper starting time is for employees. Id. In insuring that management decisions are not based on proscribed criteria, the board and ALJ must remember that it is not management's burden to justify its decisions, for the board has the affirmative duty to prove its case. Portable Electric Tools, Inc. v. NLRB, supra, 309 F.2d at 426-27. The ALJ, however, began this case by placing a burden on the Exchange and refusing to accept any justification. He neglected uncontroverted evidence and testimony and instead credited the incredible and unreasonable. Thus our rejection of the ALJ's conclusion that the Exchange violated § 8(a)(3) is merited.
 
 
 54
 After reminding the ALJ and board about their role, we also reiterate our own. We do not assess the facts of such cases as this de novo, nor do we reverse all findings we would not have made ourselves. We must, however, reverse those findings which are based on insubstantial evidence or are unreasonable. We also must reverse where we find that the facts supported in the record are insufficient for the board to meet its affirmative obligation. Portable Electric Tools, Inc. v. NLRB, supra, 309 F.2d at 426-27. We therefore set aside the board's findings and deny enforcement as to the discharged employees.
 
 B. Section 8(a)(1) Violations
 
 55
 The ALJ found six categories of Exchange violations of § 8(a)(1): threatening employees with discharge or other disciplinary action for engaging in union activities; coercively interrogating employees concerning their union sentiments and activities; placing suspected union activities of employees under company surveillance; changing its sick leave policy in reprisal for union activities; maintaining and enforcing an invalid no solicitation rule; and disparately applying bulletin board privileges.
 
 
 56
 In reviewing these § 8(a)(1) violations, we are, of course, bound by the same substantial evidence rule we followed in analyzing the § 8(a)(3) violations. The findings of these § 8(a)(1) violations typically involve selection of whom to believe on conflicting testimony, and, as a general rule, this court is bound by the credibility choices of the ALJ. Portable Electric Tools, Inc. v. NLRB, supra, 309 F.2d at 426-27. The ALJ has an opportunity to hear the testimony and view the witnesses and, therefore, is best suited to make credibility determinations. Id. On the other hand, we may also disregard these credibility determinations where we find them to be unreasonable, self-contradictory or based on inadequate reasoning. See First Lakewood Associates v. NLRB, 582 F.2d 416 (7th Cir. 1978); White Glove Building Maintenance, Inc. v. Brennan, supra, 518 F.2d at 1273. We now apply this standard to each incidence of an alleged § 8(a)(1) violation.
 
 1. Threats
 
 57
 The ALJ found numerous § 8(a)(1) violations stemming from threats that were supposedly made by several named supervisors and directed to several named employees. If substantiated by the record, there is no doubt but that the utterances in question would constitute violations of the act for, if proved, they would clearly be threats and not predictions or statements of belief as to probable consequences beyond the control of the employer. Our task therefore, is to determine if indeed there is substantial evidence to support the findings that such words were actually uttered.
 
 
 58
 a. The ALJ found that when Emil Hunter told Mrs. Ardyce Stanford that she had nothing to worry about if she was not engaged in union activities, he uttered an implied threat to the effect that she would have something to worry about if she did engage in such activities. This remark violated the act.
 
 
 59
 We have no reason to question Mrs. Stanford's veracity in this matter. And since Mr. Hunter did not come forward to testify, an inference is permissible that his honest testimony would either have been damaging to the case of the petitioner in some way, or that it would not substantially have differed from Mrs. Stanford's testimony. Her uncontradicted testimony suffices to uphold the ALJ's finding that Mr. Hunter made an implicit threat to Mrs. Stanford in violation of § 8(a)(1).
 
 
 60
 b. The ALJ found that when supervisor John Welch warned Jonathan James not to pass out union leaflets and told him to keep his nose clean because there were supervisors around who wanted him fired, he was guilty of interfering with protected activities and uttering a threat of reprisal for union activities, all in violation of the act.
 
 
 61
 Supervisor Welch's statement to James and to Miss Jean Karczynski, giving them a list of dischargeable offenses and suggesting that management would resort to pretextual excuses for discharge, such as abusive statements on the part of employees, is a threat which violates § 8(a)(1) of the act.
 
 
 62
 We find that the evidence and testimony in the record supporting the above findings are substantial, although weak. Welch unequivocally denied suggesting that management would resort to pretextual excuses for discharging employees and he denied warning James to keep his nose clean or telling James that there were supervisors who wanted him fired. Welch's testimony was not credited by the ALJ. We accept the credibility determinations made by the ALJ even though we might have found differently in these instances had the matter been before us de novo. Universal Camera Corp. v. NLRB, 340 U.S. at 488, 71 S.Ct. at 464; NLRB v. United Insurance Co. of America, 390 U.S. 254, 260, 88 S.Ct. 988, 991, 19 L.Ed.2d 1083 (1968); NLRB v. Gogin, 575 F.2d 596, 600 (7th Cir. 1978). We note also that there were definite discrepancies between the testimony of James and Karczynski, but these inconsistencies were not so serious as to make the ALJ's credibility determination inherently unreasonable.
 
 
 63
 c. The ALJ also credited statements of Miss Karczynski who testified that supervisor Dennis Sweich congratulated her for being on a "hit list" and then agreed with her that management would try to discharge all of the employees on the Union list ("hit list") although it would take a while to accomplish this end. Sweich denied referring to the Union list as being a "hit list" and said that when Miss Karczynski asked him if people on the Union list would be fired, he said "no." Sweich's denials were disbelieved. We defer here also to the ALJ's determinations and uphold his finding.
 
 
 64
 d. As above, we also uphold the ALJ's finding and determination that Torosian threatened Rochelle Stewart when he told her that her job was at stake once and was at stake again (Torosian's sworn denial notwithstanding).
 
 
 65
 e. However, we are not able to agree with the ALJ's finding that Richardson's statement to Miss Theresa Stewart, telling her to be careful about her union activities because management intended to get rid of every employee on the Union list, is a threat which violates § 8(a)(1) of the act, irrespective of whether or not officials in higher management uttered such a threat. We are unable to credit the testimony of Stewart or Richardson.
 
 
 66
 Miss T. Stewart's testimony was sketchy. For example, on cross-examination, when Attorney Schreiber tried to ascertain information regarding Miss Stewart's meetings with Richardson, he got the following responses:
 
 
 67
 Q. How many meetings were there?
 
 
 68
 A. Several.
 
 
 69
 Q. How many is several?
 
 
 70
 A. I can't remember.
 
 
 71
 Q. Well, give me a number.
 
 
 72
 A. Oh.
 
 
 73
 Q. Six, seven?
 
 
 74
 A. Maybe ten.
 
 
 75
 Q. Ten meetings in February. All in February?
 
 
 76
 A. Yes.
 
 
 77
 Later in the cross-examination, Miss T. Stewart was questioned as to whether she told anyone that Richardson had told her that she would be fired.
 
 
 78
 Q. Did you tell Rochelle Stewart this?
 
 
 79
 A. Yes, I did.
 
 
 80
 Q. When did you tell her this?
 
 
 81
 A. I don't know. I can't remember.
 
 
 82
 Q. Before or after she was terminated?
 
 
 83
 A. Before.
 
 
 84
 Q. Did you tell anyone else this?
 
 
 85
 A. No.
 
 
 86
 Q. Just Rochelle?
 
 
 87
 A. No, I probably told some more people.
 
 
 88
 Q. Can you tell me who you told?
 
 
 89
 A. No, I can't.
 
 
 90
 Q. Because you don't remember?
 
 
 91
 A. I can't recall at this moment.
 
 
 92
 Mr. Schreiber's questions above did not concern peripheral matters; they were basic and should have been easily answerable. Miss T. Stewart's testimony was incomplete, self-serving, and none of the allegations that she testified to were mentioned in the sworn affidavit that she gave to the board on March 29, 1978, concerning her discharge. On the whole, Miss Stewart's testimony is not credible.
 
 
 93
 Nor was Richardson a credible witness. His bias was obvious. Richardson worked for the Exchange for only three months before he was fired in February of 1978. And his testimony that members of management uttered antiunion statements in meetings at which he was present was refuted by 15 witnesses.
 
 
 94
 We conclude, after a thorough review of the record, that substantial evidence does not support the ALJ's credibility determinations as to the testimony of T. Stewart and Richardson and therefore we cannot uphold his finding that Richardson made statements to T. Stewart which constituted a threat or a § 8(a) (1) violation.
 
 
 95
 2. Coercive interrogation.
 
 
 96
 It is well established that interrogation of employees is not illegal per se. Section 8(a)(1) of the act prohibits employers only from activity which in some manner tends to restrain, coerce or interfere with employee rights. To fall within the ambit of § 8(a)(1), either the words themselves or the context in which they are used must suggest an element of coercion or interference. NLRB v. Virginia Electric & Power Co., 314 U.S. 469, 62 S.Ct. 344, 86 L.Ed. 348 (1941); NLRB v. Wagner Iron Works, 220 F.2d 126, 139 (7th Cir. 1955), cert. denied, 350 U.S. 981, 76 S.Ct. 466, 100 L.Ed. 850 (1956); NLRB v. Kropp Forge Co., 178 F.2d 822, 828-29 (7th Cir. 1949). We find no instances of such coercive interrogation in the case before us.
 
 
 97
 In February 1978, supervisor Milka Denich spoke with Ardyce Stanford in Denich's office, with no one else present, concerning Stanford's union activities. According to Stanford's testimony, Denich said that unions only sit on their butts, collect dues, and cause problems, and would cause old people like herself to lose their jobs and further stated that she felt that by siding with the Union, Stanford was putting a knife in her back. Denich asked Stanford how she felt about the Union; Stanford said that she had not made up her mind, and the next day Denich repeated the same question and again received no definite reply.
 
 
 98
 This exchange does not amount to coercive interrogation. When Denich conveyed her views of the consequences of unionization, she was making a noncoercive prediction. The Supreme Court has formulated a "prediction" vs. "threat" test and it was put forth in NLRB v. Gissel Packing Co., 395 U.S. 575, 618, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547 (1969).
 
 
 99
 * * * Thus, an employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as the communications do not contain a "threat of reprisal or force or promise of benefit." He may even make a prediction as to the precise effects he believes unionization will have on his company. * * *
 
 
 100
 Also, when Denich asked Stanford twice how she felt about the Union, that was not coercive interrogation. There was no implied or stated threat. Mrs. Stanford was not warned against soliciting for, or even belonging to the Union. Therefore, we are unable to uphold the ALJ's finding that Mrs. Denich coercively interrogated Mrs. Stanford.
 
 
 101
 The other finding regarding interrogation involved employee George Alvin and supervisor Kathie Staes. According to Alvin's testimony, Staes called him into her office in January 1978 and told him to stop handing out union literature. Staes' conduct in that instance may violate the act as the enforcement of an invalid no solicitation rule, but not as an act of coercive interrogation as the ALJ found. Alvin never said that Staes questioned him at all, only that she explained company policy regarding solicitation to him. Therefore we find, contrary to the ALJ, that there were no § 8(a)(1) violations regarding coercive interrogation.
 
 
 102
 3. Surveillance.
 
 
 103
 The Exchange was found to have created an impression that its employees' union activities were the subject of company surveillance in violation of § 8(a)(1) of the act. Most of the violations involving surveillance were found to have been committed against employee Mary Hrycaj by several of her supervisors and including assistant to the vice president Richard Tattas, Martin Torosian, and Dennis Sweich.
 
 
 104
 Several of the violations involving Hrycaj do not seem serious when viewed as isolated incidents. For instance, Torosian told Miss Hrycaj that her name had been "dropped around" in connection with her union activities, and Tattas told Miss Hrycaj that Torosian had said that she was active in the Union; and these statements alone do not appear to be severely improper. But when these statements are coupled with Sweich's subsequent conduct, it becomes clear that Miss Hrycaj could have reasonably concluded that her union activity had become subject to company surveillance.
 
 
 105
 Sometime in December 1977, Sweich told Miss Hrycaj that he was relocating her desk so that it would be next to his own and that she would share his telephone. Formerly Miss Hrycaj had had a desk with a telephone of her own. Hrycaj testified that Sweich told her that he wanted to know where she was at all times, and that when she asked him if the move had anything to do with her union activities, he replied that it did, in part. According to Sweich's own testimony, he moved Miss Hrycaj's desk because of her union solicitation activity during working hours and because he wanted to know what she was doing during working hours.
 
 
 106
 So when considered all together, the acts and conduct of the employer as pointed out above, constitute violations of § 8(a)(1). We therefore agree with the ALJ that Exchange created the impression that Miss Hrycaj's union activities were subject to company surveillance.
 
 
 107
 However, we do not find that when Denich told Mrs. Stanford that she had heard that Mrs. Stanford had conducted a Union meeting in her home, that this statement violated the act. When put into context with the rest of their conversation (see Coercive interrogation, supra at 1267), this statement should not have given the impression that surveillance was being conducted by petitioner against Stanford. Therefore, we are unable to uphold the ALJ's determination in this instance.
 
 
 108
 4. Change of sick leave policy.
 
 
 109
 Prior to January 1978, the Exchange followed a policy of giving department supervisors discretion in granting sick leave to employees who were required to stay home to care for sick children. It also had been discretionary as to whether a supervisor would demand a doctor's excuse from an employee to qualify for sick leave in the event of absence for personal illness. In the Member Service Department, it was the practice to permit employees to use sick leave to care for sick children, and it was not the practice to require doctors' excuses in the event of personal illness. In January 1978, a meeting of employees was held in that section at which supervisor Patty Janson announced that the previous policy would no longer be in effect, that sick leave would no longer be available for absences due to family illness, and that physicians' excuses would be required to obtain sick leave in the event of personal illness.
 
 
 110
 A storm of protest followed, and a day or so later Miss Janson informed employees that they would not have to bring in a doctor's excuse for each personal absence and that the sick leave policy revision in this respect had been rescinded. However, no change was made concerning the availability of sick leave to care for sick children.
 
 
 111
 The ALJ found that the change in sick leave policy was a violation of § 8(a) (3) and 8(a)(1) of the act. He credited testimony to the effect that Miss Janson and manager William Albreth told employees during the course of the meeting that they (the supervisors) were unhappy about the change in policy, that it was imposed upon them by higher authority, and that they felt that it was in retaliation for the Union victory at the representation election.
 
 
 112
 In finding the § 8(a)(3) and 8(a)(1) violations here, the ALJ relied solely on the testimony of Richard A. Harbeck, a Member Services representative employed by Midwest Stock Exchange. Mr. Harbeck's testimony is contrary to that of his supervisors, William Albreth and Patty Janson. Both Mr. Albreth and Miss Janson denied that they had stated that the policy changes were retaliatory. Their testimony was not credited.
 
 
 113
 According to the testimony of all three, Harbeck, Albreth, and Janson, there were nine or ten member services representatives present at the meeting. None of the other representatives were offered as witnesses or testified regarding the alleged statements of Albreth and Janson. Only Harbeck charges that the statements were made. And in his sworn affidavit of April 11, 1978, given to the Thirteenth Region of the National Labor Relations Board-Respondent's Exhibit No. 3, Mr. Harbeck discussed the meeting with Miss Janson and makes no mention of any remarks that describe the change of sick leave policy as being retaliatory.
 
 
 114
 Mr. Harbeck is not a disinterested witness. He had requested and was denied sick leave in March 1978 after he had stayed home to care for his sick son. Harbeck, Albreth, and Janson testified that at the January meeting, Mr. Harbeck stated he couldn't afford to continue to work at the company with the change in sick leave policy.
 
 
 115
 Harbeck, Albreth and Janson all testified that at the January meeting, the explanation given for the change in the sick leave policy was so that their department's policies would be uniform with those of other departments concerning the doctors' excuses.
 
 
 116
 Although the sick leave policy was changed shortly after the union election, this fact alone does not justify a finding that the change was discriminatory.
 
 
 117
 For the above reasons, we will not uphold the ALJ's finding that the change of sick leave policy was discriminatory and interfered with employees' protected activities. We hold that the change did not violate § 8(a)(1) and 8(a)(3) of the act, and we deny enforcement of the order where it directs the Exchange to pay with interest any loss of sick leave benefits incurred after January 26, 1978.
 
 
 118
 5. No solicitation rule.
 
 
 119
 On December 6, 1977, the Exchange promulgated a no solicitation rule which is, on its face, a valid exercise of their right to make necessary work rules governing the conduct of employees. It read:
 
 
 120
 It has come to our attention that some employees are engaged in solicitation activity on working time in the work areas. Please keep in mind that the company has a rule which prohibits solicitation of any kind among employees in work areas during working time. (Please restrict such activity to other locations.) Violation of this rule by any employee will subject such person to the regular disciplinary procedure. The holiday season is a time of year when solicitation for various causes is particularly heavy. It behooves us, therefore, to republish this rule as a reminder to all that the rule will be enforced as always without prejudice or favoritism for any particular cause, product, or charity.
 
 
 121
 The ALJ concluded that the establishment and implementation of this rule was, both by design and execution, an interference with activities protected by section 7 of the act.
 
 
 122
 An employer may have and enforce a rule prohibiting solicitation by union and other employees in working areas during working hours. Republic Aviation Corp. v. NLRB, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945). The Exchange issued and enforced its no solicitation rule in order to restrict Union solicitation in working areas on working time.
 
 
 123
 However, a rule respecting working time and areas is invalid if it is adopted for a discriminatory purpose. The Exchange's rule is not discriminatory on its face; it expressly prohibits "solicitation of any kind." But in practice, such was not the case. While the Exchange strictly enforced its no solicitation rule regarding Union activities on working time in working areas, it did not enforce the rule where nonunion, nonwork activities were concerned. It is clear from the record that solicitation and similar nonwork related activities regularly took place at the company, sometimes with the cooperation of supervisors. Such drives as the Crusade of Mercy, collection of blood in a bloodmobile which was brought to the Exchange's premises, the selling of Avon products, Tupperware, boat cruise tickets, raffle tickets, Girl Scout cookies, and a number of other items took place on company premises without comment or interruption. This double standard violates § 8(a)(1) since the no solicitation rule was discriminatorily enforced. Gerry's Cash Markets, Inc. v. NLRB, 602 F.2d 1021, 1024 (1st Cir. 1979); NLRB v. Sunnyland Packing Co., 557 F.2d 1157 (5th Cir. 1977); NLRB v. J.P. Stevens & Co., 563 F.2d 8, 15 (2d Cir. 1977), cert. denied, 434 U.S. 1064, 98 S.Ct. 1240, 55 L.Ed.2d 765 (1978); William L. Bonnell Co. v. NLRB, 405 F.2d 593, 595 (5th Cir. 1969). For unequal treatment of prounion and antiunion solicitation see, NLRB v. Magnavox Co. of Tennessee, 415 U.S. 322, 94 S.Ct. 1099, 39 L.Ed.2d 358, rehearing denied, 416 U.S. 952, 94 S.Ct. 1962, 40 L.Ed.2d 302 (1974); NLRB v. J. W. Mortell Co., 440 F.2d 455 (7th Cir. 1971).
 
 
 124
 In addition to constituting a general violation of § 8(a)(1), Exchange's unequal enforcement of its no solicitation rule invalidated the rule. Therefore, by enforcing the invalid rule, Exchange violated the rights of individual employees, thereby committing separate and additional violations of the act. This is true even though during the time of enforcement, both the employer and employees believed the rule to be valid. So in instances where the employers (through its supervisors) would have been correct in cautioning employees against soliciting in working areas during working hours, and where employees would have been improperly soliciting, here the employer's warnings constitute separate violations because they were enforcing an invalid no solicitation rule and the employees (although in violation of what they at the time considered to be their employer's rightful instructions) were properly exercising their section 7 rights.
 
 
 125
 Therefore, the ALJ was correct in finding the following violations:
 
 
 126
 a. When supervisor Okarski warned Mrs. Stanford in January 1977 about passing out union cards and threatened her with discharge if she did it again, the Exchange violated the act.
 
 
 127
 b. When supervisor Weaver threatened employee Lewis with discharge for soliciting on company premises, she was enforcing an illegally promulgated no solicitation rule.
 
 
 128
 c. When supervisor Sweich accused Mary Hrycaj of soliciting for the Union he was enforcing an illegally promulgated no solicitation rule.
 
 
 129
 d. When supervisor Fedor gave Miss R. Stewart a verbal warning for passing out union literature, he was enforcing an invalid no solicitation rule.
 
 
 130
 6. Bulletin boards.
 
 
 131
 One of the § 8(a)(1) violations found involved discriminatory use of the employee bulletin boards. These bulletin boards were maintained throughout the company and notices of interest to employees were posted on them including nonwork related matters such as the Crusade of Mercy, the blood donor drive as well as personal ads offering various items of property for sale. Early in January 1978, supervisor Wally Mach instructed employee Thomas Glatz to remove a union meeting notice from one of the boards. The ALJ found that this instruction violated § 8(a)(1) since it discriminated against Union notices only and did not apply to other nonwork related material. We agree and uphold this finding.
 
 C. Conclusion
 
 132
 The board's order required publication of a notice that the Exchange, would not, inter alia, coercively interrogate employees concerning their union sympathies and union activities; threaten employees with discharge or other disciplinary action because they engage in union activities; place suspected union activities of employees under company surveillance; create the impression that the union activities of the employees are the subject of company surveillance; direct employees to cease engaging in union activities; reduce sick leave benefits to take reprisal on employees for their union activities; and would not refuse to permit employees to post union notices on company bulletin boards while continuing to post other personal or nonwork-related matters. The order also required reinstatement of the five discharged employees with back pay. It is evident from our discussion that we will not enforce the reinstatement part of the order, and as to the remainder, some of it is valid and some invalid. Inasmuch as the five allegedly discriminatory discharges are part and parcel of the violations of both section 8(a)(1) and (3) of the act as found by the board, it is not clear whether the board would desire to use the mechanism of an order to deal with the relatively minor violations we have found supported by substantial evidence. From the limited amount of space devoted to them in petitioner's brief, it may be petitioner would comply with the board's desires without bringing the case here again. Accordingly, on the board's petition for enforcement, enforcement is denied. On the Exchange's petition for review, the case is remanded to the board with leave to issue a new order at the board's discretion-its terms to be consistent with the conclusions of this opinion.
 
 
 
 *
 The Honorable Philip Nichols, Jr., Associate Judge of the United States Court of Claims, is sitting by designation