NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

ELDORADO MANUFACTURING COR-
PORATION and United Steelworkers of
America, AFL–CIO, Respondents.

No. 80–2101.

United States Court of Appeals,
Seventh Circuit.

Argued April 28, 1981.

Decided Sept. 24, 1981.

Rehearing and Rehearing In Banc
Denied Nov. 13, 1981.

James Callear, Atty., N.L.R.B., Washington, D.C., for petitioner.

Donald V. Ferrell, Harrisburg, Ill., Soloman I. Hirsh, Hirsh & Schwartzman, Chicago, Ill., for respondents.

Before CUMMINGS, Chief Judge, CUDAHY, Circuit Judge, and WYATT,* Senior District Judge.

CUMMINGS, Chief Judge.

The National Labor Relations Board has petitioned us pursuant to Section 10(e) of the National Labor Relations Act (Act) (29 U.S.C. § 160(e)) to enforce its May 20, 1980, order against the Eldorado Manufacturing Corporation (the Company) and the United Steelworkers of America, AFL–CIO (the Union).[1] The order requires the Company to offer reinstatement with back pay to two discharged employees, Jerry Miller and Allen Davidson, with the Union jointly and severally liable with the Company for reimbursement of the lost wages. The Union was also required to notify the Company that the Union has no objection to the reemployment of Miller and Davidson. Both the Company and the Union were directed to post certain notices. We deny enforcement because the discharges were

---

* The Honorable Inzer B. Wyatt, Senior Judge of the Southern District of New York, is sitting by designation.

1. Only the International Union is a party to this case. No complaint was filed against the Local Union by the Board's General Counsel. The Board's decision and order are reported at 249 NLRB No. 88.

justified by the misconduct of the two former employees.

## I

The Company operates a small plant in Eldorado, Illinois, that produces valves for machinery. Its eleven production and maintenance employees are represented by the Union. Their contract is administered at the basic level by an employee-elected bargaining and grievance committee consisting of the shop steward and two committeemen.

Since at least the summer of 1978, the eleven employees were divided into two antagonistic groups. One group (the Davidson-Miller faction) was led by Allen Davidson and Jerry Miller and included employees Tom Horton, Gordon Donnelly, Jeff Beam and Leon Wiseman. The other group (the Pennell-Cox faction) consisted of Bud Pennell, Bob Cox, Ivan Butler, Charlie Daniels and Fred Anderson. The Davidson-Miller faction was openly hostile and vulgar to members of the other faction and engaged in such conduct as:

> "abusive, obscene and vicious language, feigned vomiting gestures; breaking the other faction's coffee cups; intentionally wasting company-provided coffee so that the other faction could not drink coffee; and breaking a Company chair so that employee Cox could not sit on it while operating his machine in the plant" (App. 57).

Davidson also destroyed a part from Cox's motorcycle. According to Davidson, his group's behavior was caused by the other group's "taking sides with the company" (Tr. 202–203). Davidson admitted that the Pennell-Cox faction did not engage in comparable conduct (Tr. 202–203). Davidson also admitted that from time to time, Plant Manager Herschel Hiller heard complaints about Davidson's and Miller's misconduct and warned them especially that their jobs were in jeopardy if they persisted in such conduct.

In November 1978, the Davidson-Miller faction initiated a recall of Ivan Butler, a member of the Pennell-Cox faction, as shop steward. The employees voted to replace Butler with Leon Wiseman, then a member of the Davidson-Miller faction, and elected Davidson and Horton, another member of the Davidson-Miller faction, to serve as his committeemen.

On February 13, 1979, the employees began a strike against the Company over the terms of a new contract. The strike concluded on April 2, 1979, with the execution of a new two-year contract. The new contract was negotiated by the employees' bargaining and grievance committee (Wiseman, Davidson and Horton) with the assistance of Union Representative Richard Blackburn. During the strike, Miller and Davidson became dissatisfied with Wiseman's performance as steward. Miller felt that Wiseman was not picketing enough, and Davidson thought that Wiseman was not taking a sufficiently strong position in the contract negotiations. Antagonism between the Davidson-Miller faction and Wiseman, who by this time was taking his coffee breaks with the Pennell-Cox faction, was aggravated by the so-called "key incident." Prior to the strike, several employees had keys to the plant so that they could begin work even if Plant Manager Hiller arrived late. During the strike, some employees, including Wiseman, agreed among themselves not to accept keys when they returned to work. Thus, if Hiller were late, the employees could leave and collect four hours' "call-in" pay. However, shortly after the strike ended, Wiseman accepted a key from Hiller and showed it to Miller. Miller threatened that if Wiseman used the key Miller would see to it that the door would not open again. Three or four days later, the lock on the door was jammed and had to be replaced, even though Wiseman had returned the key to Hiller.

After the strike the Davidson-Miller group increased its disruptive and abusive behavior and now included Wiseman as one of its targets. Davidson admittedly yelled at Plant Manager Hiller, greased the other group's tools and lathes, broke their coffee cups and sought to prevent them from drinking coffee, physically harassed them

and called them "suck ass" and "company sucks." Miller admittedly greased the handles of Wiseman's and other employees' machines, gave Wiseman "the finger," feigned "sucking and vomiting sounds at Wiseman," held his nose when Wiseman walked by, called Wiseman a "company suck" and threatened to slash Wiseman's and Pennell's automobile tires. He also told Plant Manager Hiller that he did not operate the plant correctly. Davidson had received several warnings from Hiller concerning his efforts to prevent the Pennell-Cox group from drinking coffee (Tr. 201–202).

In mid-April, Miller and Horton circulated a petition to remove Wiseman as shop steward and replace him with Davidson. The petition was put aside when majority support was not forthcoming.

On April 27, Davidson filed a grievance claiming that Plant Manager Hiller had on the previous day performed some bargaining unit work. At Davidson's request, Wiseman called a grievance meeting with Hiller. At the meeting, Pennell, who had been with Hiller at the time of the disputed events, supported Hiller's claim that he had not done bargaining unit work. Davidson then went to the lunchroom and placed sand in Pennell's salt shaker. On April 30, at a second grievance meeting called at Davidson's insistence and concerning the same matter, Hiller accused Davidson of being a troublemaker and stated that the Davidson-Miller group was raising petty matters. Contemporaneously, Miller drew two extremely obscene pictures of Wiseman, one with Union Representative Blackburn and the other with Hiller. At Miller's suggestion, Davidson and Jeff Beam, one of Davidson's supporters, hung the drawings at Wiseman's workplace. A few days later, Pennell, who had worked for the Company for 20 years, told Hiller that he, Pennell, could not continue to work for the Company in view of the disruptive situation there.

On May 4, Bob Cox demanded a shop meeting concerning a dispute between him and Davidson about the operation of a machine tool. Hiller agreed with Cox's posi-

tion and told Davidson to stop causing trouble. Davidson thereupon told Hiller that if he addressed Davidson in the future, Davidson wanted his union representative present. When Hiller pointed out that Wiseman was present, Davidson retorted, "I said any time, Jack." [2] At that point Hiller gave Davidson a written warning slip for disobedience. Also on May 4, Davidson threatened Cox by raising a broom at him. Miller stated in the hearing before the Administrative Law Judge (ALJ) that approximately one week before his discharge he also was warned by Hiller concerning his troublemaking (Tr. 58–59).

On May 7, the employees held a union meeting at the plant with Union Representative Blackburn present. Davidson called the meeting in an attempt to oust Wiseman as shop steward. According to Davidson, Wiseman was lax in calling grievance meetings. When a majority of those present refused to vote Wiseman out, Davidson and Horton resigned from the grievance committee. Pennell and Cox were elected to replace them. Shortly thereafter, Miller admitted to Pennell that Miller was not operating his lathe at full speed and was going to see "that the door is shut on this place." Pennell told Hiller of this threat. On May 10, possibly as a protest to the new grievance committee, Miller, Davidson and Horton went to the table occupied by the Pennell-Cox faction during lunch and dumped soda pop all over the table and spat soda thereon.

On the morning of May 11, Miller again smacked his lips, held his nose and made other vulgar gestures and faces at Wiseman, causing Wiseman to become pale and sick-looking. Wiseman then decided to ask Plant Manager Hiller for a vacation and accordingly asked grievance committee members Cox and Pennell to accompany him to Hiller's office. Thereupon, a one and one-half to two-hour meeting took place with Hiller. At that meeting Wiseman complained to Hiller that he needed a two-week vacation immediately to avoid a

---

2. Hiller's first name is Herschel.

nervous breakdown because the Davidson-Miller behavior was affecting his work and personal life so much that he did not even know if he could return to the Company after his vacation. He told Hiller of the continuous abuses to which he had been subjected in the five weeks after the strike ended on April 2. Cox and Pennell agreed that the harassment had gotten out of hand. Both Pennell and Cox said they would quit if the chaotic conditions in the plant were not corrected. One of the three told Hiller that Anderson and Butler were also fed up and wanted to quit. Both Anderson and Butler previously had complained to Hiller about the actions of Davidson and Miller (Tr. 318–319). All participants in the meeting denied that the three employees present asked Hiller to discharge Davidson and Miller.

After the conclusion of an ensuing meeting with Miller and Davidson, Hiller discharged them on the ground that they had harassed Company employees to the extent of disrupting the work force. He explained at the September 1979 hearing on the complaint before the ALJ that essential senior employees would otherwise have left the Company.

After Miller and Davidson learned that they were being terminated, they sought the assistance of the grievance committee, and Wiseman arranged a meeting for them with the committee and Union Representative Blackburn on May 15. At that meeting, Davidson and Miller admitted that they were responsible for harassing the plant employees. Blackburn told Miller and Davidson that they did not have a good chance of being reinstated, but that he would talk with Hiller and, if unsuccessful, would "go through the [grievance] procedure." Davidson said that he wanted to write his grievance (Tr. 153) and had the necessary grievance forms (Tr. 229) and both he and Miller understood the grievance procedure (Tr. 525), but Miller stated that he had secured other employment on May

11 and consequently did not want his job back. Blackburn asked Davidson not to file a grievance for about a week so that Blackburn could talk to Hiller first. Both Davidson and Miller were familiar with the grievance machinery.

A few days later, Blackburn and the Union attorney spoke to Hiller, who refused to reinstate Davidson and Miller. After trying unsuccessfully to reach Wiseman, Blackburn called Cox and told him to tell Wiseman to notify Davidson and Miller that Hiller would not agree to take them back and that they could go ahead with their grievances. Wiseman subsequently spoke to Davidson and inquired if he had the necessary grievance forms. Davidson said he did and requested from Wiseman the Local Union's number, which was 14812 (General Counsel Exhibit 2 at p. 14). Later, when Wiseman stopped at Davidson's home to give him the requested number, Davidson said he didn't need it. His next move was in July when he filed his initial charges with the Labor Board. As the ALJ found,

> "there was no 'attempt' by the discriminatees to file written grievances and there was no refusal by the Union to accept them" (App. 20).

On the basis of the foregoing record,[3] the ALJ concluded after a hearing that the Union violated Section 8(b)(2) and (1)(A) of the Act by causing the discharges of Davidson and Miller because of their intra-union activity; that the Union violated Section 8(b)(1)(A) of the Act by failing to notify Miller and Davidson that it was willing to process their grievances; and that the Company had violated Section 8(a)(1) and (3) of the Act by discharging Miller and Davidson at the Union's demand. The Board affirmed the ALJ's decision and adopted his recommended order with two minor modifications.

## II

Section 8(b)(1)(A) of the Act makes it an unfair labor practice for a union to

---

**3.** As in *Midwest Stock Exchange, Inc. v. National Labor Relations Board*, 635 F.2d 1255, 1263 (7th Cir. 1980), our discussion of the facts follows the Administrative Law Judge's findings where based on substantial evidence but not when based on scintilla evidence or when contrary to the record.

"restrain or coerce * * * employees in the exercise of the rights guaranteed in Section 7 * * * " of the Act.[4] Section 8(b)(2) makes it an unfair labor practice for "a labor organization or its agents * * * to cause or attempt to cause an employer to discriminate against an employee in violation of subsection 8(a)(3)." Subsection 8(a)(3) provides in pertinent part that it is an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment * * * to encourage or discourage membership in any labor organization." Thus it is unlawful for a union or its agents to cause an employer to discharge an employee because of his opposition to the union leadership or its policies. *E. g., Local No. 444, Iron Workers v. National Labor Relations Board*, 426 F.2d 229, 230 (7th Cir. 1970). Here the Board concluded that the Union committed such an unlawful act on the basis of findings that Wiseman, acting as an agent of the Union, delivered an ultimatum to Hiller to discharge Davidson and Miller because of protected intra-union activities. These findings are not supported by substantial evidence.

■ First, as the Supreme Court explained in *Carbon Fuel Co. v. Mine Workers*, 444 U.S. 212, 217, 100 S.Ct. 410, 414, 62 L.Ed.2d 394, to hold a union liable for the acts of its agents, "it must be clearly shown . . . that what was done was done by their agents in accordance with their fundamental agreement of association."[5] The Court added that to establish a union's liability under the doctrine of *respondeat superior* evidence must be offered that the "International Union instigated, supported, ratified, or encouraged" the activity in question. 444 U.S. at 218, 100 S.Ct. at 414, quoting with approval 582 F.2d 1346, 1351 (3d Cir. 1978) in the same case. In the present case,

there is nothing in the record to show that Wiseman, Pennell and Cox were acting "in accordance with their fundamental agreement of association" or that the Union "instigated, supported, ratified or encouraged" the discharges. These three employees were elected by their fellow employees rather than designated by the Union under the collective bargaining agreement and were present at the May 11 meeting as individuals on behalf of themselves and other employees distressed by Davidson's and Miller's misconduct. Indeed, far from the Union's endeavoring to cause the discharges, its agent Blackburn attempted to have Miller and Davidson reinstated four days after the discharges took place.

Second, the record does not support the Board's finding that Wiseman presented Hiller with an ultimatum to discharge Miller and Davidson. Indeed, all four participants in the meeting testified to the contrary and the unrebutted evidence shows that the resolution of the discipline problem was left with Hiller. The fact that Wiseman commented to employees Horton and Beam after the meeting that "he had to do it" does not support an inference that he demanded their discharges since it is entirely compatible with his testimony and the testimony of others that he had simply reached the point where he felt he had to complain about the continuing harassment.

■ Finally and most importantly, the record does not support the finding that Wiseman, Pennell and Cox sought to have Davidson and Miller punished because of protected intra-union activities. The complaints of Wiseman, Pennell and Cox concerned the manner in which Davidson and Miller had chosen to vent their contempt for the Pennell-Cox faction. The Board, however, found that Miller's and Davidson's

---

4. Section 7 of the Act provides:

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activi-

ties except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8(a)(3) of this Act." 29 U.S.C. § 157.

5. This quotation from *Carbon Fuel Co.* came from an opinion of Chief Justice Taft in *Coronado Coal Co. v. Mine Workers*, 268 U.S. 295, 304, 45 S.Ct. 551, 554, 69 L.Ed. 963.

misconduct was "not so obstreperous or obstructive as to prevent Wiseman from performing his job as Steward" (App. 12) and that their offensive and vulgar behavior did not justify the action taken by Wiseman, Pennell and Cox (App. 17). We cannot agree. While employees are afforded considerable leeway in their expression of disagreement with union or employer policies, this case does not present an isolated moment of intemperate behavior or misconduct committed in the course of internal union functions, but a continuing pattern of petty, vulgar and disruptive acts in the workplace that goes well beyond the scope of protection afforded by the Act. See *Sullair P.T.O., Inc. v. National Labor Relations Board*, 641 F.2d 500 (7th Cir. 1981); *National Labor Relations Board v. Truck Drivers, Oil Drivers, Etc.*, 630 F.2d 505 (7th Cir. 1980), certiorari denied *sub nom. Gilmer v. Truck Drivers*, 450 U.S. 1030, 101 S.Ct. 1740, 68 L.Ed.2d 225; *American Telephone & Telegraph Co. v. National Labor Relations Board*, 521 F.2d 1159 (2d Cir. 1975); *National Labor Relations Board v. Red Top, Inc.*, 455 F.2d 721 (8th Cir. 1972); *Indiana Gear Works v. National Labor Relations Board*, 371 F.2d 273 (7th Cir. 1967). The ALJ acknowledged that Davidson's and Miller's acts had created anarchy and could not be condoned but concluded that a violation of the Act had nevertheless occurred because motivation for the action of Wiseman, Pennell and Cox "was based *in part* upon discriminatory elements" (App. 17, emphasis supplied). However, the Board itself has rejected the "in part" test for discriminatory discharges and adopted the test developed by the Supreme Court in *Mt. Healthy City School Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471. See *Wright Line, A Div. of Wright Line, Inc.*, 251 NLRB No. 150, 105 LRLM 1169

(1980); see also *Sullair P.T.O., Inc., supra; Stein Seal Co. v. National Labor Relations Board*, 605 F.2d 703 (3d Cir. 1979); *Liberty Mutual Insurance Co. v. National Labor Relations Board*, 592 F.2d 595 (1st Cir. 1979). Under the *Mt. Healthy* test, a *prima facie* case of discrimination is rebuttable by a showing of justification. Here the record overwhelmingly shows that the discharges were justified. Therefore, even assuming that the Union requested the discharges, there was no violation of Sections 8(b)(2) and (1)(A).

 The dissent contends that the May 11 meeting was a "misuse of Union * * * power." We disagree, for Union representatives can be and here were proper vehicles for communicating employee dissatisfaction to management, even concerning the disruptive actions of other employees. There was no unfair labor practice because the complaints of the Union representatives were entirely legitimate.

### III

 As follows from the foregoing discussion, the Board's finding that the Company violated Section 8(a)(1) and (3)[6] of the Act by discharging Miller and Davidson is also unsupported by substantial evidence. The ALJ found that Plant Manager Hiller discharged the two employees principally because of Wiseman's demand, but was receptive to the demand because he was annoyed by Davidson's having complained that Hiller had performed bargaining unit work. The ALJ acknowledged that Hiller would have been justified in discharging Miller and Davidson for misconduct, but found that the discharges were not so motivated since Hiller had previously acquiesced in the misconduct by not disciplining or

---

**6.** Section 8(a)(1) provides:

"(a) It shall be an unfair labor practice for an employer—

"(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in Section 7 of the Act." 29 U.S.C. § 158(a)(1).

Section 8(a)(3), as noted in the text, *supra*, provides in pertinent part:

"(a) It shall be an unfair labor practice for an employer—

"(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization * * *." 29 U.S.C. § 158(a)(3).

discharging Miller and Davidson earlier.[7] This finding is contrary to the uncontroverted evidence that Hiller spoke to Miller and Davidson on several occasions about their misconduct both before and after the strike and that Hiller did not previously take formal disciplinary action because he believed the situation would "settle down" after a new contract was signed. Thus rather than indicating anti-union bias, Hiller's failure to act against Davidson and Miller earlier shows exceptional tolerance of intra-union disagreement. In fact, the situation after the strike deteriorated to the point where Hiller believed he was faced with a choice of losing valuable senior employees or letting Miller and Davidson go.

The Board in its brief argues that there "were no out-of-the-ordinary occurrences in the shop between May 7, the date of the Union meeting at which Wiseman's ouster was sought, and May 11, when Wiseman and the [two other] Union committeemen demanded that Hiller fire Miller and Davidson" so that the "inference is compelling" that the discharges were motivated by Davidson's and Miller's participation in protected activities (Br. 20–21). However, the Board (and the ALJ) conveniently overlook the facts that Wiseman had known about the attempt to oust him since mid-April, that some time between May 7 and May 11, Pennell reported to Hiller that Miller was not operating his lathe at full speed and intended to see "that the door is shut on this place,"[8] that on May 10, Miller and Davidson poured and spat soda pop on the table at which the Pennell-Cox faction was eating; and that the May 11 meeting was immediately precipitated by Miller again making obscene gestures directed at Wiseman.

The Board's case against the Company rests at bottom on the apparent notion that blatant misconduct once tolerated at all must be tolerated forever. However, as this Court has previously stated, "[t]here must be room in the law for a right of an employer somewhere, sometime, at some stage, to free itself of continuing, unproductive, internal, and improper harassment." *National Labor Relations Board v. Truck Drivers, supra*, 630 F.2d at 509. To ascribe any motive to these discharges other than a long overdue intolerance of Davidson's and Miller's offensive and disruptive acts would be to indulge in unwarranted speculation. Neither the Board nor this Court can decide cases on such a basis. *Midwest Stock Exchange v. National Labor Relations Board*, 635 F.2d 1255 (7th Cir. 1980). Accordingly, we hold that the Company discharged Miller and Davidson for good cause and did not violate Section 8(a)(1) and (3) of the Act.

IV

Finally, we cannot agree with the Board that the Union violated Section 8(b)(1)(A) by failing to notify Miller and Davidson that it was willing to process their grievance over the discharges. Liability for failure to process discharge grievances cannot attach unless the grievances would have been meritorious and unless the Union's failure to process was in bad faith. *Hines v. Anchor Motor Freight Co.*, 424 U.S. 554, 570, 96 S.Ct. 1048, 1059, 47 L.Ed.2d 231, *Vaca v. Sipes*, 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842. The grievances here were, as discussed above, not meritorious because the discharges were for just cause based on serious misconduct and therefore not a violation of the collective bargaining agreement. In addition, there was no bad faith shown on the part of the Union.

Following the May 11 discharges, Wiseman scheduled a meeting for Miller and Davidson on May 15 with himself, the two other grievance committeemen, and Union Representative Blackburn. At that meeting, Blackburn told Davidson and Miller that they had little chance of being reinstated, but that he would talk to Hiller

---

7. For example, the ALJ recognized that Miller's threat to see "that the door is shut on this place" would justify Miller's discharge under *Tama Meat Packing Corp.*, 230 NLRB 116 (1977) if Hiller had acted on it immediately, instead of discharging Miller four days later (App. 16).

8. See note 7 *supra*.

and that if Hiller would not agree to reinstatement Blackburn would process their grievances. Miller stated that he had another job and did not want to file a grievance. Davidson indicated that he wanted to write his grievance and had the necessary grievance forms and Blackburn knew that Davidson was familiar with the grievance procedure. Within a few days, Blackburn spoke unsuccessfully to Hiller and then informed Wiseman (through Cox) that Davidson and Miller could file their grievances. It is true that Wiseman never relayed this message to Miller, but it was plainly unnecessary to do so since Miller had already stated that he did not want to file a grievance.[9] While Wiseman did not relay Blackburn's message to Davidson in exact terms, apparently because he simply assumed that Davidson was going ahead with the grievance, he did contact Davidson to inquire if he had the necessary grievance forms. Davidson said that he did and that he did not need the Local Union's number, which he had previously requested from Wiseman. Since Blackburn had already told Davidson and Miller that he would process their grievances if his efforts to have Hiller to agree to reinstatement failed and since Davidson knew that Hiller had not agreed to reinstate him, it would be absurd for us to conclude, as the Board would have us do, that Davidson believed the Union would not process his grievance. Yet, as the ALJ found, Davidson never filed a written grievance and did not contact Blackburn or any other union official about doing so. Because the Union never refused to accept the grievance and would in any event have been justified in doing so, it was erroneous for the Board to conclude that the Union violated Section 8(b)(1)(A) for bad faith handling of Davidson's and Miller's grievances.

 Here the Board has saddled the Company and Union with joint and several liability to make whole any loss of wages sustained by Miller and Davidson (App. 24–25, 26). By analogy to suits under Section 301(a) of the Labor Management Relations Act (29 U.S.C. § 185(a)), such liability should be imposed only if the discharges were contrary to the collective bargaining contract and if the Union breached its duty of fair representation. *Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 570–571, 96 S.Ct. 1048, 1059, 47 L.Ed.2d 231.[10] Neither factor was present here. Likewise, the record does not show that any Section 7 rights of Miller and Davidson were responsible for their discharge. Enforcement will be denied.[11]

CUDAHY, Circuit Judge, dissenting:

There is no question that substantial evidence supports the Board's order here. The majority has simply elected to credit, rely on or emphasize other evidence or to draw different inferences from the evidence than the Board and has quite flagrantly substituted its judgment for that of the Board.[1]

---

**9.** Significantly, the complaint herein was based on charges filed by Davidson alone (App. 1).

**10.** This rule was recently reiterated in *United Parcel Service, Inc. v. Mitchell,* 451 U.S. 56, 61–64, 101 S.Ct. 1559, 1563–64, 67 L.Ed.2d 732, and *Clayton v. International Union, U.A.W.,* 451, U.S. 679, 690, n.15, 101 S.Ct. 2088, 2096, n.15, 68 L.Ed.2d 538.

**11.** All arguments not expressly discussed in this opinion have, nevertheless, been duly considered. They have been found either wanting in merit or insufficiently important to warrant extended discussion. Their discussion would not have altered this decision.

**1.** For example, the Administrative Law Judge and the Board found that, "[a]lthough the evidence shows that the Miller-Davidson faction (of which Wiseman was a member until after the strike ending April 2, 1979) appeared to be the more aggressively vulgar, there is no dispute on this record that each faction behaved badly to and irritated the other." App. at 4.

The Administrative Law Judge and the Board also noted that,

[Hiller's] *one act* of disciplining Davidson, on May 4, for insubordination, stemmed not from Davidson's misconduct with co-employees (which was the gravamen of Wiseman's and Pennell's complaints), but rather from a direct confrontation with Hiller himself. Miller's conduct with respect to Hiller, in any event, in no way precipitated Wiseman's demand for Davidson's and Miller's discharges and I reject Hiller's assertion at the hearing that it was an underlying cause for the two discharges.

App. at 18 (emphasis supplied).

The majority notes that, "The Board's case against the Company rests at bottom on the apparent notion that blatant misconduct once tolerated at all must be tolerated forever." *Ante*, at 1214. This is not the point at all; the point is that plant manager Hiller hardly raised a hand against Davidson and Miller, leading Union "radicals," until the leaders of the newly dominant "conservative" faction met with him for two hours to demand the ouster of their rivals and adversaries. Recently there had been much bad blood between shop steward Wiseman and the Davidson-Miller element, and Wiseman switched factions to the Cox-Pennell contingent. There is certainly abundant evidence, applying *Mt. Healthy* or any other relevant test, to support a conclusion that the principal and proximate (if not the only) cause of the discharges of Davidson and Miller was the urgings of shop steward Wiseman and grievance committee members Cox and Pennell, which met with the prompt and sympathetic acquiescence of plant manager Hiller.[2] After all, Davidson and Miller were not fired, or seriously threatened with firing for misconduct with other employees, *see* note 1, *supra*, until *immediately* after Wiseman, Cox and Pennell—the Union

powers—closeted themselves with Hiller for almost two hours.[3]

In fact, before May 1979, in the four and a half years of his being plant manager, Hiller had never discharged an employee or even issued a warning or formal reprimand because of misconduct in the shop. The Administrative Law Judge and the Board concluded that, "employee discipline, whether management-imposed or self-imposed, in the plant, at all material times, was anarchic . . . [but that] Hiller [knew] of these derelictions in his shop, but openly ignored the situation on the ground that either it would improved [sic] or abate." App. at 15. Hiller even failed to take action when informed that Miller was not operating his machine at full speed and that Miller threatened to shut the Company down, App. at 16, actions that would have clearly justified discharging Miller.

Wiseman, Cox and Pennell, who demanded the discharges, were the only Union officials ordinarily on the premises. It is, therefore, disingenuous in the extreme to suggest that they were not agents of the Union, fully clothed with apparent authority. They *were* the Union for all practical purposes at Eldorado.[4] This case is impor-

---

2. The Board concluded that

Hiller discharged Miller and Davidson *only* because of the urging of Respondent-Union, which urgings found an entirely sympathetic ear in Hiller because of Hiller's desire, as a matter of Respondent-Employer's interest, to rid itself [sic] of two employees who were continually showing dissatisfaction and causing him 'aggravation' because of his alleged contract violations in doing unit work. App. at 16 (emphasis supplied). This analysis *at the very least* supports the view that, without the urgings directed at the Company by the Union leaders, there would have been no firings. The Company, therefore, has not carried its burden under *Mt. Healthy.*

"[T]he District Court should have gone on to determine whether the [employer] had shown by a preponderance of the evidence that it would have reached the same decision as to [the employee's] reemployment even in the absence of the protected conduct." *Mt. Healthy City Board of Ed. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977).

3. The analysis of the testimony by the Administrative Law Judge (and the Board) is that

whereas Wiseman specifically denied that he asked for their discharges, I credit Cox that

Wiseman threatened to quit because of the abuse from 'those two,' naming Davidson and [Miller] and I have credited Horton and Beam who testified, without contradiction, that later on the same date, May 11, after Miller and Davidson had been discharged, Wiseman told them 'I had to do it.' This has no reference, in my estimation, other than to the fact that Wiseman had urged Hiller to discharge Miller and Davidson.

App. at 15.

4. The Board stated that

The uncontradicted evidence shows that these three employees [Wiseman, Cox and Pennell] and their predecessors represent the unit (together with the Union business agent Richard Blackburn, where matters concern negotiation of terms of a collective-bargaining agreement) in collective bargaining and individual unit employees in their grievances with Respondent-Employer pursuant to the terms of the collective-bargaining agreements between Respondents.

App. at 3 n. 1. This state of facts established a prima facie agency of the three to act for the Union in matters of discharges and grievances.

tant because, as perceived by the Board and based on the evidence, the Company did the bidding of the Union in destroying what had become its dissident faction. The majority seems to be unconcerned about the import of this dangerous collusion, provided there is evidence that the faction destroyed is uncouth and obnoxious.

To me the misuse of Union and Company power [5] to violate the rights of employees who at the time are in ill favor with the shop steward (whom they have tried unsuccessfully to replace) and the grievance committee (which has been turned over to their rivals) is of controlling significance in this case. Whether the employees fired were incidentally irritating and obnoxious should not be determinative. We should not allow concern for factory decorum to blind us to injustice in the abuse of power. Of course, under other circumstances, it might have been acceptable to fire Davidson and Miller for misconduct. But here no one appears to have thought of that course until the victims had a falling out with the shop steward and Davidson and Horton were replaced by their adversaries as committeemen. Company power should not be used as an instrument of Union politics.

There is also substantial evidence to support the Board's finding that the Union failed to accept and process the Miller and Davidson grievances when Union representative Blackburn committed the matter to the tender loving care of Wiseman—a prime antagonist of the terminated duo.[6]

I therefore respectfully dissent.

---

5. The majority's defense of "Union representatives ... [as] proper vehicles for communicating employee dissatisfaction to management, even concerning the disruptive actions of other employees," at 1213, conveniently ignores the spectacle of the Company's ultimate weapon of discharge in the service of Union power directed at a competing Union faction. Substantial evidence and inferences properly drawn from it support the Board's view.

6. The Board found that, although Miller said at a grievance meeting on May 15, 1979, that he did not want his job back, he also said he wanted his backpay. The majority is therefore incorrect in its assumption that Miller had abandoned his grievance. App. at 31–32 n. 4.