803 F.2d 1333
 123 L.R.R.M. (BNA) 2774, 55 USLW 2287,
105 Lab.Cas. P 12,078
 WASHINGTON MATERIALS, INC., t/a Buffalo Concrete; District
Concrete Company, Inc.; Howat Concrete Company, Inc.;
Maloney Concrete Company; Silver Hill Concrete Corporation
and Super Concrete Corporation, Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
Chamber of Commerce of the U.S. Amicus Curiae/R.
DRIVERS, CHAUFFEURS, AND HELPERS LOCAL UNION NO. 639,
INTERNATIONAL BROTHERHOOD OF TEAMSTERS,
CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF
AMERICA, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
Chamber of Commerce of the U.S. Amicus Curiae/R.
 Nos. 85-2018, 86-3001.
 United States Court of Appeals,
Fourth Circuit.
 Argued July 17, 1986.
Decided Oct. 23, 1986.
Rehearing Denied Nov. 26, 1986 in No. 85-2018.
 
 Adin C. Goldberg, Spengler, Carlson, Gubar, Brodsky & Frischling, New York City, William H. Willcox, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., Jonathan G. Axelrod, (John R. Mooney, Beins, Axelrod & Osborne, P.C., Washington, D.C., on brief), for petitioners.
 Judith A. Dowd (Rosemary M. Collyer, General Counsel, John E. Higgins, Jr., Deputy General Counsel, Robert E. Allen, Associate General Counsel, Elliott Moore, Deputy Associate General Counsel, W. Christian Schumann, Supervisor, N.L.R.B., Washington, D.C., Louis J. D'Amico, Regional Director, Baltimore, Md., Hugh J. Beins, Washington, D.C., on brief), for respondent.
 Peter G. Nash, Dixie L. Atwater, William G. Prins, Ogletree, Deakins, Nash, Smoak & Stewart, Stephen A. Bokat, National Chamber Litigation Center, Washington, D.C., on brief, for amicus curiae.
 Before WIDENER, HALL, and MURNAGHAN, Circuit Judges.
 K.K. HALL, Circuit Judge:
 
 
 1
 Washington Materials, Inc. is a corporation comprised of six ready-mix concrete suppliers in Washington, D.C. and its surrounding suburbs, including parts of Maryland and Virginia. The six companies, which trade as Washington Materials, Inc., are Buffalo Concrete, District Concrete Company, Inc., Howat Concrete Company, Inc., Maloney Concrete Company, Silver Hill Concrete Corporation, and Super Concrete Corporation ("Buffalo," "District," "Howat," "Maloney," "Silver Hill," "Super," or, collectively, the "Companies"). The Drivers, Chauffeurs, and Helpers Local Union No. 639, International Brotherhood of Teamsters, Chauffeurs, Warehousemen, and Helpers of America ("the Union") represents the Companies' drivers and yardmen.
 
 
 2
 In these consolidated appeals, the Companies petition for review of an order of the NLRB (the "Board"), in which the Board found violations of Sections 8(a)(5), (3) and (1) of the National Labor Relations Act (the "Act"), 29 U.S.C. Sec. 158(a)(5), (3), and (1). The Union petitions for review of other portions of the same order. The Board has filed a cross-application for enforcement of its order. We enforce in part and deny in part the Board's order.
 
 I.
 
 3
 The Companies consist of all of the unionized ready-mix concrete suppliers in the Washington, D.C. area. The six Companies are in competition both with each other and with non-union concrete suppliers, which have been able to obtain a progressively larger share of the market in recent years. The Companies' most recent collective bargaining contract with the Union expired on May 15, 1982.
 
 Contract Negotiations
 
 4
 Late in 1981, the Companies contacted Daniel George, the Union's president, and suggested the possibility of early contract negotiations. On January 7, 1982, George met for the first time with William Willcox, the Companies' attorney and designated bargaining agent. Willcox took the position that the Companies had to narrow the cost gap between union and non-union wages, overtime, and fringe benefits in order to obtain more concrete supply jobs. George responded that he understood the problem, but that "take-backs" or concessions were a serious matter. George also stated that members of the Union believed that some of the Companies were conducting double-breasted operations, i.e. non-union businesses in addition to their unionized operations.
 
 
 5
 The next bargaining session, which took place on February 2, 1982, was attended by most of the Companies' chief executive officers. At that meeting, George specifically alleged that four of the companies owned or controlled non-union businesses. When Willcox replied that the Companies were not there to discuss double-breasted operations, George responded that the Union was going to have "one hell of a problem" trying to convince its membership to accept concessions to combat non-union competition when the employees reported working on the same job with non-union employees whom they believed to be under the control of the Companies.
 
 
 6
 Two days later, at the next formal bargaining session, the Companies presented written contract proposals, which included a number of reductions in wages and benefits. After the parties discussed the proposals, the Union stated that it would make the Companies "an offer that [they] couldn't refuse" if the Companies would discuss their relationships with non-union businesses. Specifically, the Union offered to accept a 30 percent reduction in wages if the Companies would "put their non-Union companies on the [bargaining] table." Willcox responded that the Companies could not talk about double-breasting and curtailed further discussion of the Union's cut-back offer.
 
 
 7
 At a bargaining session on April 19, 1982, the Companies proposed several specific wage and benefit reductions. George replied that he needed to look at the Companies' books. The Companies refused, and the bargaining session ended.
 
 
 8
 During subsequent bargaining sessions, George reiterated that the Union wanted to look at the Companies' books. He explained to Willcox that he thought that the books would show, among other things, that Super Concrete and some of the other Companies were subsidizing non-union operations.
 
 
 9
 At some point during the bargaining session on May 10, 1982, Willcox asserted that the Companies were losing job bids to non-union competitors because of the Companies' higher labor costs. In response, George asked the Companies to name the competitors to whom they had lost specific bids, but the Companies refused to provide the Union with that information.
 
 
 10
 On May 12, 1982, the Union sent letters to Willcox and to each of the six Companies, stating, in pertinent part, as follows:
 
 
 11
 In order for the Union to fashion, realistically, a response to your latest proposal, the local union must have the following information:
 
 
 12
 (1) Certified year end financial statement for the year ending December 31, 1981....
 
 
 13
 (2) A list of all bids submitted by you or an agent of your company on your behalf relative to performing any work covered by your collective bargaining agreement with Local Union No. 639.
 
 
 14
 (emphasis in original).
 
 
 15
 The parties discussed the Union's information requests at the next bargaining session, which took place on May 13. Willcox took the position that the requested information would not be helpful to the Union. On May 15, the collective bargaining agreement expired and the Union filed unfair labor practice charges with the Board based upon the Companies' refusal to provide financial information.
 
 
 16
 On May 21, Willcox sent George a letter, again denying the Union's information requests and stating that:
 
 
 17
 As we have said very often, to know the reason for our position and the facts that must be dealt with on your side of the table, as on ours, you don't need our "financial statements". You have only to look about you. It is as evident to you as it is to us that the amount of work and the amount of jobs have been steadily eroding for years in the face of the non-union competition.... The labor costs of the non-union companies are, as you know, substantially below those of the unionized companies.... Therefore the reason we have made our proposals is to try to bring our labor costs and productivity and assurances of uninterrupted deliveries more in line with those of the non-unionized companies, although our labor costs would still be very substantially above, and our productivity below, those of the non-unionized companies even if you agreed to all our proposals....
 
 
 18
 At the next bargaining session, which took place on May 24, Willcox asked the Union to make a proposal. George responded that the Companies had still not honored the Union's requests for information from the Companies' books, which he suspected would show whether Buffalo, Maloney, Super, and Howat had double-breasted relationships with certain non-union companies. The Companies thereafter modified some of their take-back proposals.
 
 
 19
 At a subsequent Union membership meeting, George went through the Companies' contract proposals item by item. George explained the foreseeable impact of the information requested by the Union on the direction of the contract negotiations. As an example, he stated that if the job-bid information indicated that the Companies were legitimately losing bids, the Union would have to recommend that the employees accept reductions. George further stated, however, that if the job-bid information showed that some Companies were deliberately bidding high on jobs in order to channel work to non-union affiliates, the Union would oppose any take-backs. The employees then voted to strike against the Companies in the event that no bargaining agreement would be reached by midnight on May 27.
 
 
 20
 At subsequent bargaining sessions, the Companies withdrew or modified most, but not all, of their remaining take-back proposals. When the Companies refused the Union's renewed request for additional information, George announced that the Union would have no choice but to recommend a strike to the employees.
 
 
 21
 On the evening of May 26, the Union held a membership meeting to address the Companies' latest contract proposals. George concluded his presentation of the proposals by stating that in view of the Companies' steadfast refusal to provide information, the Union had no choice but to honor the employees' May 25 strike vote. Some of the employees asked George whether the information requested by the Union would show whether or not the Companies had a financial interest in double-breasted operations. George replied affirmatively. In response, some of the employees commented that it was grossly unfair for the Companies to complain about non-union competition when they were actually competing with themselves.
 
 The Strike and its Aftermath
 
 22
 The strike began on May 27, 1982. During May and June, each of the Companies wrote to George and provided some of the information which he had earlier requested, including lists of jobs for which they had submitted bids. Between June 18 and June 22, George sent letters to the Companies informing them that the material which they had submitted did not satisfy the Union's oral or written information requests. George stated that the Companies' job-bid information was insufficient to enable the Union to assess the Companies' claim of competitive disadvantage, because the list of jobs did not disclose such relevant details as the amount bid by the Company and the names of the successful bidders. In his letters to the six Companies George further stated that "[t]he Union wanted to know how it (the Union) could, in good faith, explain to its members that [the employer association's] proposals were realistic when [Union] member[s] viewed the companies as competing with themselves...."
 
 
 23
 On July 15, 1982, the Union sent a telegram to Willcox and to each of the Companies making an unconditional offer to return to work on behalf of all of the striking employees. After the telegram was sent, strikers began returning to work. Although some were not immediately reinstated, most of the strikers were eventually reemployed.
 
 
 24
 On July 20, Willcox wrote to the Union and emphasized that the Companies needed wage and benefit reductions because their higher labor costs put them at a competitive disadvantage with respect to the non-union sector of the business. Willcox also stated that the "majority" of the Companies' non-union competitors had no connection with any members of the employer association. In his letter, Willcox specifically disavowed the idea that the Companies were unable to pay higher wages, asserting that they had only maintained a desire to narrow the labor cost gap between the unionized Companies and their non-union competitors.
 
 
 25
 The parties held several bargaining sessions during August and September, but were unable to reach any bargaining agreement. The Companies continued to operate under substantially the same economic terms and conditions established in the collective bargaining contract that had expired the preceding May.
 
 Super's Refusal to Reinstate Johnson
 
 26
 On June 2, 1982, Wesley Northington and Charles Johnson, along with one other striking Super employee, attempted to attend a court hearing on Super's request for a temporary restraining order against violence associated with the strike. There was uncontradicted testimony that the three men "disturbed the proceedings" and were not allowed in the courtroom.
 
 
 27
 After leaving the courthouse together, they appeared about thirty minutes later at a construction site where two non-striking Super drivers, Ecton and Brown, were driving Super delivery trucks loaded with concrete. While the trucks were at the job site, the foreman, McDonald Sparrow, saw Northington on top of Ecton, pounding Ecton in the head with his fist. After being told by Sparrow to stop, Northington hit Ecton in the arm and face with a shovel. Sparrow grabbed the shovel from Northington and hung on to it, forcing Northington to let go of it. Northington then left the scene. As Northington was leaving, Sparrow saw Johnson and heard him yell to Brown, who was in one of the Super delivery trucks, "Don't get on that radio." Johnson then departed in the same direction as Northington. According to one striking Super employee, Johnson later said "I did not want to bust [Ecton's] head up," a remark which the employee interpreted to mean Johnson claimed responsibility for the assault. As a result of this incident, Johnson was denied reinstatement at the conclusion of the strike.
 
 Maloney's Refusal to Reinstate Winter
 
 28
 Edward A. Winter is a mixer driver who has worked for Maloney since 1965. During his employment, Winter was the subject of numerous customer complaints and disciplinary warnings, involving poor attitude and behavior. Between January, 1976, and April, 1982, he received sixteen reprimands for violating various company rules. Two of these incidents were described as major offenses. He was also suspended from his job on two occasions.
 
 
 29
 Other drivers complained repeatedly about Winter's belligerent and uncooperative behavior and he had to be transferred among Company facilities a number of times because of problems, including fights, with other employees. Moreover, there was testimony that in early 1982 two Union shop stewards informed Maloney's president that they would work with management to get rid of Winter. Following the strike, thirteen employees also signed a petition, urging Maloney not to reinstate Winter in order to prevent him from causing further friction among customers, management, and employees.
 
 
 30
 Early in March, 1982, Winter failed to report back to work from a seasonal layoff in a timely fashion and was denied reemployment for the 1982 construction season on that account. Winter filed a grievance and, after George's intervention, was reemployed.
 
 
 31
 When the strike began, Winter joined it and picketed the Maloney plant from time to time. He assumed no leadership role in the strike and did nothing to otherwise distinguish himself from the rest of the striking employees. After the strike was over, Winter reported to the plant but was never reemployed. On October 19, 1982, after George contacted Maloney about the situation, the employer terminated Winter, citing his "terrible" job performance.
 
 The ALJ's Decision
 
 32
 The Board filed a complaint against the Companies and the matter was heard by an ALJ. The ALJ found that the six Companies had violated the Act by refusing to provide the Union with their 1981 financial statements. The ALJ concluded that the Union was entitled to this information because the Companies had made their financial ability to pay an issue during the collective bargaining negotiations and the refusal to provide the financial statements caused the strike. The ALJ further found that four of the Companies (Buffalo, Maloney, Howat, and Super) committed a further unfair labor practice by failing to provide the "double-breasting" information requested by the Union.
 
 
 33
 In addition, the ALJ concluded that Maloney had violated the Act by discharging Winter because of his union membership. Finally, the ALJ found that Super's refusal to reinstate Johnson was not a violation of the Act.
 
 The Board's Decision
 
 34
 The Board affirmed in part and reversed in part the ALJ's decision. The Board agreed with the ALJ that Buffalo, Maloney, Howat, and Super had violated the Act by refusing to furnish the Union with information concerning their relationships with certain non-union operations. The Board further found that this refusal to furnish information concerning alleged double-breasted operations was a contributing cause of the employees' strike against the four Companies and that the strike was, therefore, an unfair labor practice strike.
 
 
 35
 However, contrary to the conclusion reached by the ALJ, the Board found that the Companies had not raised a claim of inability to pay and, therefore, did not violate the Act by refusing to turn over their financial statements to the Union. Finally, the Board concluded that the refusal to reinstate both Winter and Johnson was a violation of the Act.
 
 II.
 
 36
 In its appeal, the Union contends that the Board erred in finding that the Companies' refusal to furnish financial statements was not an unfair labor practice. In their appeal, the Companies contend that the Board's findings concerning the refusal by four of the Companies to furnish the Union with information about alleged double-breasted operations is not supported by substantial evidence. The Companies also contend that the Board erred in ordering the reinstatement of both Winter and Johnson. We uphold the Board's findings and conclusions with regard to the issues involving the financial statements and the double-breasting information as supported by substantial evidence. We conclude, however, that the Board erred in ordering the reinstatement of Winter and Johnson.
 
 
 37
 In NLRB v. Truitt Manufacturing Co., 351 U.S. 149, 153, 76 S.Ct. 753, 756, 100 L.Ed. 1027 (1956), the Supreme Court held that an employer's "refusal to attempt to substantiate a claim of inability to pay increased wages may support a finding of a failure to bargain in good faith." In the instant case, the Board, unlike the ALJ, refused to equate an employer's desire not to pay wages and benefits as an inability to make such payments. As the Board concluded:
 
 
 38
 [A]t the first negotiating session Willcox stated that unionized contractors were not competitive due to the large inroads into the industry made by the non-union contractors. Willcox consistently repeated this theme throughout the entire bargaining process. At no time did the Respondents assert they were unable to pay what was required under the union contract proposals but rather consistently maintained they wanted to obtain a more competitive position in the industry. The Respondents thus had no Truitt obligation to provide the Union with all their financial records and therefore did not violate Section 8(a)(5) and (1) by refusing the Union's request for that information.
 
 
 39
 The Seventh Circuit recently came to the same conclusion in a similar case, observing that:
 
 
 40
 the mere assertion by an employer that it is operating at a competitive disadvantage does not, in and of itself, constitute a claim of inability to pay. The relevant test, as articulated by this court, is to ascertain whether the employer said it 'would not' as opposed to 'could not' pay the employees' proposed demands. Only in the latter situation where the employer communicated that it 'could not' pay the demands has it made a claim of inability to pay.
 
 
 41
 NLRB v. Harvstone Manufacturing Corp., 785 F.2d 570, 575-76 (7th Cir.1986) (citations and footnote omitted). Cf. Empire Terminal Warehouse Company, 151 NLRB 1359 (1965), aff'd sub nom. Dallas General Drivers, Warehousemen and Helpers, Local No. 745 v. NLRB, 355 F.2d 842 (D.C.Cir.1966) (employer's refusal to provide union with its financial books and records did not violate Section 8(a)(5) of the Act, where the employer's position was not based on inability to pay but on assertion that labor costs placed it in a disadvantageous position with respect to its competitors).
 
 
 42
 We find that the Board's analysis in the instant case is reasonable and that its finding in favor of the Companies on the financial disclosure issue is supported by substantial evidence. We, therefore, will not disturb that finding on appeal.[1]
 
 III.
 
 43
 Likewise, we perceive no grounds for overturning the Board's conclusion that four of the Companies committed an unfair labor practice by failing to furnish the requested double-breasting data. Certainly, the Union's information concerning the alleged double-breasted operations was sufficient to trigger a duty to disclose relevant data. See Walter N. Yoder & Sons v. NLRB, 754 F.2d 531, 536 (4th Cir.1985) (reports by union members that employer was interchanging work and employees with non-union business was sufficient to require disclosure); NLRB v. Leonard B. Hebert, Jr. & Co., Inc., 696 F.2d 1120, 1123-26 (5th Cir.) cert. denied, 464 U.S. 817, 104 S.Ct. 76, 78 L.Ed.2d 88 (1983) (union members' observations of work interchange at alleged double-breasting jobsite were among the reasons cited for finding a duty to disclose). Moreover, as the Board pointed out in its decision, the record establishes that the issue of double-breasted operations was discussed throughout the negotiations. The Union's letters of May 12, 1982, merely reduced to writing its previous requests for double-breasting information made during the discussions at the bargaining table. These requests, made well in advance of the strike, provided adequate notice to the Companies that such information was being sought. See NLRB v. Rubatex Corp., 601 F.2d 147, 151 (4th Cir.), cert. denied, 444 U.S. 928, 100 S.Ct. 269, 62 L.Ed.2d 185 (1979) (bargaining table exchange about which group of employees should have received a bonus gave rise to employer's duty to disclose information about the bonus); NLRB v. Bagel Bakers Council of Greater New York, 434 F.2d 884, 887-888 (2d Cir.1970), cert. denied, 402 U.S. 908, 91 S.Ct. 1380, 28 L.Ed.2d 648 (1971) (bargaining table discussion constituted sufficient notice to employer that union was requesting financial information to substantiate a claim of inability to pay present level of wages). After considering the Companies' various arguments on this issue, we reject them as meritless and sustain the Board's findings as supported by substantial evidence.
 
 IV.
 
 44
 We find no support, however, for that portion of the Board's order which requires Super to reinstate Johnson. The Board overturned the ALJ's finding that Super was justified in denying reinstatement to Johnson because of his deliberate association with Northington's beating of Ecton. Unlike the ALJ, the Board refused to attach any significance to Johnson's remark, "Don't get on that radio," shouted to the other Super driver. Upon review of the record, however, we find no substantial evidence to support the Board's conclusion.
 
 
 45
 The uncontroverted facts[2] are that Johnson and Northington were at the courthouse on the day in question, "disturbing the proceedings;" they left together and appeared together thirty minutes later at a site where replacement drivers were working; Northington beat Ecton in the face and body with a shovel; Johnson rendered no assistance to Ecton and immediately after the beating threatened the replacement driver seeking medical and/or police help by yelling at him "Don't get on that radio;" Johnson and Northington then left the scene almost simultaneously; later, Johnson made a statement that was interpreted to mean he claimed responsibility for the attack. The Board's conclusion ignores these facts. By ordering the driver not to seek medical help for Ecton and not to call the police to apprehend the perpetrator of the violence, Johnson fully associated himself with Northington's criminal acts. Accordingly, Super was amply justified in refusing to reinstate Johnson following the strike and the Board's order to the contrary cannot stand.
 
 V.
 
 46
 We, likewise, refuse to enforce that portion of the Board's order requiring Maloney to reinstate Winter. Winter's "terrible" job performance, cited by his employer as the reason for his discharge, is undeniable. Nevertheless, the Board and the Union rely on the fact that the employer tolerated Winter's poor work performance in the past and waited to discharge him until after his participation in the strike.
 
 
 47
 In some circumstances, such conduct on the part of an employer can be sufficient to find an improper motive for the discharge. See, e.g. NLRB v. Waco Insulation, Inc., 567 F.2d 596, 600-01 (4th Cir.1977) (discharge following employee's participation in concerted activity was unlawful regardless of his unsatisfactory work record, where there were no new complaints prior to his discharge and employee's poor work performance was not articulated as the reason for his discharge at the time he was fired). Where antiunion animus is a factor in the employer's decision to discharge an employee, an unfair labor practice is established. McLean Trucking Co. v. NLRB, 719 F.2d 1226, 1227 (4th Cir.1983). However, the mere exercise of protected rights does not immunize an employee from discharge and it is error to accord no weight to an employee's performance deficiencies. Id. at 1228, 1230-33.
 
 
 48
 In NLRB v. Eldorado Mgf. Corp., 660 F.2d 1207 (7th Cir.1981), the Seventh Circuit refused to enforce the Board's reinstatement order, where the discharges were justified by previously tolerated employee misconduct. In that case the court criticized the "notion that blatant misconduct once tolerated at all must be tolerated forever." Id. at 1214. Citing its previous decision in NLRB v. Truck Drivers, Oil Drivers, etc., 630 F.2d 505, 509 (7th Cir.1980), cert. denied sub. nom. Gilmer v. Truck Drivers, 450 U.S. 1030, 101 S.Ct. 1740, 68 L.Ed.2d 225 (1981), the Seventh Circuit observed:
 
 
 49
 'there must be room in the law for a right of an employer somewhere, sometime, at some stage, to free itself of continuing, unproductive, internal, and improper harassment.' .... To ascribe any motive to these discharges other than a long overdue intolerance of [the discharged employees'] offensive and disruptive acts would be to indulge in unwarranted speculation.
 
 
 50
 Id.
 
 
 51
 In this case, we conclude that the record does not support a finding of improper motive. Dissatisfaction with Winter's poor job performance, attitude, and behavior was widespread among management, customers, and his fellow employees. Moreover, by his own admission, Winter did nothing during the strike to set him apart from other striking employees. Significantly, no other striking employee engaging in the same type of activity as Winter was discharged. Absent a showing that Winter was a more active union participant than the other striking employees, there is no basis for a finding that he was a potential or actual target of discriminatory treatment or that his discharge was retaliatory. NLRB v. Appletree Chevrolet, Inc., 608 F.2d 988, 993-94 (4th Cir.1979); Firestone Tire & Rubber Co. v. NLRB, 539 F.2d 1335, 1338 (4th Cir.1976); Torrington Company v. NLRB, 506 F.2d 1042, 1047 (4th Cir.1974).
 
 
 52
 In Firestone Tire & Rubber Co. v. NLRB, supra at 1337, we held that:
 
 
 53
 When good cause for criticism or discharge appears, the burden which is on the Board is not simply to discover some evidence of improper motive, but to find an affirmative and persuasive reason why the employer rejected the good cause and chose a bad one.
 
 
 54
 Firestone Tire & Rubber Co. v. NLRB, supra at 1337. We conclude that in this case the Board failed to sustain its burden of showing improper motive. Accordingly, we deny enforcement as to the portion of the order which finds Maloney in violation of the Act for refusing to reinstate Winter.
 
 VI.
 
 55
 For the reasons stated in Parts II and III of this opinion, we enforce the Board's order insofar as it (1) refused to find a violation of the Act for the Companies' failure to disclose its financial records to the Union and (2) found a violation of the Act for the failure of four of the Companies to disclose to the Union information pertaining to their involvement in non-union operations. For the reasons expressed in Parts IV and V, we deny enforcement as to those portions of the Board's order requiring the reinstatement of Johnson and Winter.
 
 
 56
 ENFORCED IN PART, DENIED IN PART.
 
 
 
 [1]
 Nor do we find any merit to the Union's contention that a remand is required to address factual disputes on the financial disclosure issue. Our examination of the record confirms that throughout the negotiations, the Companies, through their designated bargaining agent, consistently maintained that they were not claiming inability to pay. Any isolated remarks suggesting that an individual entity had some financial problems is insufficient to undermine the Board's conclusion that the Companies' bargaining position did not raise a claim of inability to pay. See NLRB v. Harvstone Mfg. Co., 785 F.2d 570, 576 (7th Cir.1986) (isolated words and phrases indicating financial problems were insufficient to overcome employers' clear bargaining position that they were not claiming inability to pay); ACL Corp. d/b/a Atlanta Hilton & Tower, 271 NLRB 1600, 1602 (1984) (employer's references to unfavorable economic conditions and refusal to deny or confirm that hotel was making profit did not amount to a claim of inability to pay); Empire Terminal Warehouse Co., 151 NLRB 1359, 1371 (1965), enf'd sub nom. Dallas General Drivers, Warehousemen & Helpers, Local No. 745 v. NLRB, 355 F.2d 842, 845 (D.C.Cir.1966) (although making references to losing customers and "things ... getting rough," employer did not claim inability to pay)
 
 
 [2]
 Johnson, who was present during the hearing in this case, did not testify. The Union presented no evidence and the Board's General Counsel presented no evidence other than the discharge paper